AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original    ☐ Duplicate Original



LODGED
CLERK, U.S. DISTRICT COURT
10/3/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ RYO _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
**10/03/25**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MR _____ DEPUTY

|  |  |
|---|---|
| United States of America<br><br>v.<br><br>SALVATORE ANTHONY NANIA, also known as<br>("aka") "Crook," aka "C,"<br>SALVADOR PEREZ, aka "Smokey," aka "Reckless,"<br>ANGELICA WERTZ, aka "Dizzy,"<br>LEOPOLDO CANO-RODRIGUEZ, aka "Camel,"<br>VICTOR RENEE ZEPEDA RODRIGUEZ, aka<br>"Shadow,"<br>JOSHUA ORDAZ, aka "YG,"<br>JESSE JULIAN LOPEZ, aka "Seko,"<br>RENE BALANZAR, aka "Suspect,"<br>JOSE VICENTE CASTRO, aka "Rojo,"<br>RICHARD ANTHONY MANDAC, aka "Richie,"<br>EDRAS EMMANUELLE ENRIQUEZ DURAN, aka<br>"Herk," aka "John Wick,"<br>JOSEPH DOMINIC GIACCO, aka "Spanky,"<br>DAVID TITUS, aka "Criminal," and<br>ANTHONY RONALD GANDARA, aka "Bimbo,"<br><br>Defendants | Case No.    2:25-mj-06155-DUTY |

# CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning on a date unknown and continuing to the present, in the county of Los Angeles in the Central District

of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1962(d) | Racketeer Influenced and Corrupt Organizations Conspiracy (Defendants NANIA, PEREZ, WERTZ, CANO-RODRIGUEZ, ZEPEDA RODRIGUEZ, ORDAZ, LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and GANDARA only) |

AUSA: Kelsey A. Stimson x8230

| 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), (b)(1)(B) | Conspiracy to Possess with Intent to Distribute Controlled Substances (Defendants NANIA, PEREZ, WERTZ, CANO-RODRIGUEZ, ZEPEDA RODRIGUEZ, ORDAZ, LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and GANDARA only) |
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm and Ammunition (Defendant MANDAC only) |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Kristi Anson*
*Complainant's signature*

_____
Kristi Anson, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    October 3, 2025                    _____
*Judge's signature*

City and state:    Los Angeles, California            Hon. Pedro V. Castillo, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kelsey A. Stimson x8230

## Contents

I.    INTRODUCTION..........................................4

II.   PURPOSE OF AFFIDAVIT..................................5

III. PERSONS, PROPERTY, AND PREMISES TO BE SEARCHED........7

IV.   ITEMS TO BE SEIZED...................................9

V.    SUMMARY OF THE INVESTIGATION........................10

VI.   SUMMARY OF PROBABLE CAUSE...........................13

VII. TRAINING AND EXPERIENCE ON RACKETEERING OFFENSES.....16

VIII.    TRAINING AND EXPERIENCE ON ROBBERY AND EXTORTION
      OFFENSES..........................................17

IX.   TRAINING AND EXPERIENCE ON FIREARMS OFFENSES........20

X.    TRAINING AND EXPERIENCE ON DRUG OFFENSES............21

XI.   STATEMENT OF PROBABLE CAUSE.........................23

      A.   The Rancho San Pedro Enterprise.................24

          1.   Background and Structure of Rancho San Pedro
              ...........................................24

          2.   RSP Is a Racketeering Enterprise...........27

          3.   The RICO Conspiracy Targets Engaged in a
              Drug-Trafficking Conspiracy................30

      B.   Probable Cause for Targets and the Subject
          Premises and Vehicle...........................32

          1.   SALVATORE ANTHONY NANIA....................32

          2.   SALVADOR PEREZ.............................35

          3.   DAVID TITUS................................37

          4.   RENE BALANZAR..............................45

          5.   JOSE VICENTE CASTRO........................54

          6.   VICTOR RENEE ZEPEDA........................62

           7.   JOSEPH DOMINIC GIACCO......................66

          8.   ANGELICA WERTZ.............................71

1

9.    JOSHUA ORDAZ................................78

10.    ANTHONY RONALD GANDARA.....................82

11.    LEOPOLDO CANO-RODRIGUEZ....................86

12.    JESSE JULIAN LOPEZ.........................89

13.    EDRAS EMMANUELLE ENRIQUEZ DURAN...........92

14.    RICHARD MANDAC.............................96

XII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES.........101

XIII.    REQUEST FOR NIGHTTIME SERVICE..................105

XIV. CONCLUSION.......................................105

ATTACHMENT A-1.......................................107

ATTACHMENT A-2.......................................108

ATTACHMENT A-3.......................................109

ATTACHMENT A-4.......................................110

ATTACHMENT A-5.......................................111

ATTACHMENT A-6.......................................112

ATTACHMENT A-7.......................................113

ATTACHMENT A-8.......................................114

ATTACHMENT A-9.......................................115

ATTACHMENT A-10......................................116

ATTACHMENT A-11......................................117

ATTACHMENT A-12......................................118

ATTACHMENT A-13......................................119

ATTACHMENT A-14......................................120

ATTACHMENT A-15......................................121

ATTACHMENT A-16......................................122

ATTACHMENT A-17......................................123

ATTACHMENT A-18......................................124

ATTACHMENT A-19........................................125

ATTACHMENT B-1.........................................126

XV.   SEARCH PROCEDURE FOR DIGITAL DEVICES...............129

ATTACHMENT B-2.........................................134

SEARCH PROCEDURE FOR DIGITAL DEVICES....................136

## AFFIDAVIT

I, Kristi Anson, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1.   I am a Special Agent with the United States Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), where I have been employed since April 2021.  In that capacity, my duties include investigating federal criminal offenses, primarily in the Central District of California.  During my tenure as an HSI Special Agent, I have successfully completed approximately 472 hours of instruction of the Criminal Investigators Training Program, and 536 hours of instruction of the HSI Special Agent Training at the Federal Law Enforcement Training Center in Glynco, Georgia.  During my employment with HSI, I have received classroom and on-the-job training in federal criminal laws, customs laws, and immigration and nationality laws of the United States.  I routinely refer to these laws and training during the course of my duties as a Special Agent investigating violations of these laws.

2.   I am currently assigned to the Special Agent in Charge Los Angeles Violent Gang Task Force, which investigates criminal gang activity.  The Los Angeles Violent Gang Task Force is focused on the identification and targeting of street gang members involved in criminal activities with a nexus to organized street gang exploitation with the primary goal of disruption and dismantlement of organized street gangs. Criminal activities include acts of violence, murder, extortion,

illicit narcotics transactions, trafficking of weapons and various other associated crimes.  During these investigations, I have become familiar with the methods used by criminal organizations to bring, transport, and sell narcotics and firearms, and the money laundering activities of drug trafficking organizations.  I have reviewed and collected evidence, conducted surveillance, and executed several state and federal search and arrest warrants.  I have also attended trainings related to drug interdiction, Mexican Cartels, social media and internet investigations, building prosecutable cases and Organized Crime Drug Enforcement Task Force financial investigations. I am familiar with the methods, language, structures and criminal activities of street gangs and transnational gangs operating in and throughout Southern California and the Central District of California.  As part of this investigation, I have been involved in the monitoring and surveillance of court-authorized interception of wire, oral and electronic communications.

## II. <u>PURPOSE OF AFFIDAVIT</u>

3.    This affidavit is made in support of criminal complaints and arrest warrants for:

a.    SALVATORE ANTHONY NANIA, also known as ("aka") "Crook," aka "C" ("NANIA"); SALVADOR PEREZ, aka "Smokey," aka "Reckless" ("PEREZ"); ANGELICA WERTZ, aka "Dizzy" ("WERTZ"); LEOPOLDO CANO-RODRIGUEZ, aka "Camel" ("CANO-RODRIGUEZ"); VICTOR RENEE ZEPEDA, aka "Shadow" ("ZEPEDA"); JOSHUA ORDAZ, aka "Youngster," aka "YG" ("ORDAZ"); JESSE JULIAN LOPEZ, aka "Seko"

("LOPEZ"); RENE BALANZAR, aka "Suspect" ("BALANZAR"); JOSE VICENTE CASTRO, aka "Rojo" ("CASTRO"); EDRAS EMMANUELLE ENRIQUEZ DURAN, aka "Herk," aka "John Wick" ("DURAN"); JOSEPH DOMINIC GIACCO, aka "Spanky" ("GIACCO"); DAVID TITUS, aka "Criminal" ("TITUS"); and ANTHONY RONALD GANDARA, aka "Bimbo" ("GANDARA") (collectively, the "RICO Conspiracy Targets"), for a violation of Title 18, United States Code, Section 1962(d) (Racketeer Influenced and Corrupt Organizations Conspiracy);

b. NANIA, PEREZ, WERTZ, CANO-RODRIGUEZ, ZEPEDA, ORDAZ, LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and GANDARA for a violation of Title 21, United States Code, Sections 846, 841(b)(1)(A), (b)(1)(B) (Conspiracy to Possess with Intent to Distribute Controlled Substances); and

c. RICHARD ANTHONY MANDAC, aka "Richie" ("MANDAC") for a violation of Title 18, United States Code, Section 922(g)(1) (Felon in Possession of a Firearm or Ammunition).

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts are approximate, and all dates and times are on or about those indicated.

### III. <u>PERSONS, PROPERTY, AND PREMISES TO BE SEARCHED</u>

5.    This affidavit is also made in support of warrants to search the following:

a.    The person of TITUS, as described more fully in Attachment A-1;

b.    The premises at 2611 East Washington Street, Carson, California, 90810 ("**SUBJECT PREMISES 1**"), where TITUS is believed to reside, as described more fully in Attachment A-2;

c.    The person of BALANZAR, as described more fully in Attachment A-3;

d.    A white 2014 Kia Soul bearing California license plate "9KJU375" ("**SUBJECT VEHICLE 1**"), registered to a person believed to be BALANZAR's girlfriend ("L.C."), and believed to be used by BALANZAR, as described more fully in Attachment A-4;

e.    The premises at America's Best Value Inn Rancho Palos Verdes, formerly known as Hotel Aqua Mar, Room 205, 29601 South Western Avenue, Rancho Palos Verdes, California, 90275, ("**SUBJECT PREMISES 8**"), where BALANZAR is believed to reside, as described more fully in Attachment A-19;

f.    The person of CASTRO, as described more fully in Attachment A-5;

g.    The premises at 1530 South Gaffey Street, San Pedro, California, 90731 ("**SUBJECT PREMISES 2**") as described more fully in Attachment A-6;

h.    The person of ZEPEDA, aka "Shadow" ("ZEPEDA"), as described more fully in Attachment A-7;

i.   The premises at 326 West 11th Street, Apartment 15, San Pedro, California, 90731 ("**SUBJECT PREMISES 3**"), where ZEPEDA is believed to reside, as described more fully in Attachment A-8;

j.   The person of GIACCO, as described more fully in Attachment A-9;

k.   The premises at 132 North Grand Avenue, Apartment D, San Pedro, California 90731 ("**SUBJECT PREMISES 4**"), as described more fully in Attachment A-10;

l.   The person of WERTZ, as described more fully in Attachment A-11;

m.   The premises at 762 West 30th Street, Apartment 11, San Pedro, California, 90731 ("**SUBJECT PREMISES 5**"), as described more fully in Attachment A-12,

n.   The person of ORDAZ, as described more fully in Attachment A-13;

o.   The premises at 488 North Bandini Street, San Pedro, California, 90731 ("**SUBJECT PREMISES 6**"), where ORDAZ is believed to reside, as described more fully in Attachment A-14;

p.   The person of GANDARA, as described more fully in Attachment A-15;

q.   The white and brown recreational vehicle ("RV") bearing California license plate "5XVB179" and registered to Anthony Ronald Gandara, 322 Grand Avenue, San Pedro, California, 90731, that is parked at the recreational park located at 1551 East Young Street, Wilmington, California, 90744 ("**SUBJECT**

**PREMISES 7**"), where GANDARA is believed to reside, as described more fully in Attachment A-16;

6. A blue Samsung cellular phone with scratches on the screen with IMEI 356408512380374, believed to be used by DURAN ("**SUBJECT DEVICE 1**"); a blue Vortex cellular phone with serial number J240175017, model number J24, believed to be used by BALANZAR ("**SUBJECT DEVICE 2**"); and a blue Samsung cellular phone with a cell phone case bearing a "One-Team" sticker, listed under LAPD Item #6, believed to be used by LOPEZ ("**SUBJECT DEVICE 3**"), all currently maintained in the custody of the Los Angeles Police Department in Los Angeles, California, as described more fully in Attachment A-17; and

7. A digital forensic copy of an Android with IMEI 015735002448847, from a cell phone believed to be used by MANDAC ("**SUBJECT DEVICE 4**"), currently maintained in the custody of Homeland Security Investigations in Los Angeles, California, as described more fully in Attachment A-18.

8. Attachments A-1 through A-18 are incorporated herein by reference.

## IV. ITEMS TO BE SEIZED

9. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1962(a), (d): Racketeer Influenced and Corrupt Organizations ("RICO") Conspiracy; 21 U.S.C. § 846: Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances; 21 U.S.C. §§ 841(a): Possession with Intent to Distribute Controlled Substances; 18 U.S.C. §§ 924(c)(1)(A);

Use, Carry, Brandish, and Discharge, During and in Relation to,
and Possession of, a Firearm in Furtherance of, a Crime of
Violence and a Drug Trafficking Crime; 18 U.S.C. § 922(g)(1):
Felon in Possession of a Firearm or Ammunition; 18 U.S.C. § 933:
Firearms Trafficking (the "Subject Offenses"), as described more
fully in Attachments B-1 and B-2, which are incorporated herein
by reference.

10. For the search of the persons of TITUS, BALANZAR,
CASTRO, ZEPEDA, GIACCO, WERTZ, ORDAZ, GANDARA; the search of
**SUBJECT PREMISES 1-8**; and **SUBJECT VEHICLE 1**, as described in
Attachments A-1 through A-16, and A-19, the requested search
warrants seek authorization to seize evidence, fruits, or
instrumentalities of violations of 18 U.S.C. § 1962(d)
(Racketeer Influenced and Corrupt Organizations Conspiracy),
including digital devices, from which the requested search
warrants seek authorization to seize evidence, fruits, or
instrumentalities of violations of the Subject Offenses, as
described more fully in Attachment B-1.

11. For the search of **SUBJECT DEVICES 1-4**, as described in
Attachments A-17 and A-18, the requested search warrant seeks
authorization to seize evidence, fruits, or instrumentalities of
violations of the Subject Offenses, as described more fully in
Attachment B-2.

## V.  <u>SUMMARY OF THE INVESTIGATION</u>

12. Homeland Security Investigations (the "HSI"), the
Federal Bureau of Investigation (the "FBI"), and the Los Angeles
Police Department (the "LAPD") have been conducting a years-long

investigation into the conduct of the Rancho San Pedro gang ("RSP"), a criminal street gang operating in the San Pedro area of Los Angeles County. RSP is a criminal enterprise whose members engage in, among other things, murder, drug trafficking, robbery, extortion, firearms trafficking and prohibited firearm possession. RSP operates under the control and direction of the Mexican Mafia.

13.    As set forth in detail below, through the course of the investigation, agents gathered information from a variety of sources including: (1) confidential human sources; (2) surreptitious recordings, including Title III wiretaps; (3) search warrants for residences and phones and consent searches of phones; (4) toll records showing communications between conspirators and RSP enterprise members and associates; (5) cell-site location information from numerous phones, including WERTZ, CANO-RODRIGUEZ, ZEPEDA, ORDAZ, LOPEZ, MANDAC, CASTRO, DURAN, GIACCO, TITUS and GANDARA; and (6) interviews of witnesses and victims.  The investigation employed various additional investigative techniques, including surveillance, vehicle tracking, pole cameras, recording devices, interaction with confidential sources, and information gleaned through undercover purchases of firearms and narcotics.

14.    The United States District Court for the Central District of California authorized multiple Title III wire and electronic interception orders for telephones being used by

certain subjects of the investigation, including NANIA, TITUS, LOPEZ, GIACCO, ZEPEDA, and CASTRO.[1]

15.  Since the inception of this investigation, the FBI, the HSI, LAPD, United States Attorney's Office for the Central District of California, and other local agencies have interviewed more than 50 individuals, including subjects of the investigation who agreed to voluntarily provide information. Based on information learned from these individuals and other sources, FBI SAs, HSI SAs, and LAPD detectives requested and obtained additional search warrants and subpoenas.

16.  Below, I summarize the information and evidence obtained thus far from these various investigative tools where relevant to the requested complaint and warrants.  Where recorded calls are discussed herein, I have identified the speakers in intercepted calls based on personal knowledge of the speaker's voice from direct interactions with them, listening to recorded jail calls, or reviewing video depicting them, or based on conversations with other law enforcement officers who identified the speakers based on such sources.  Additionally, on some recorded communications the speakers self-identified with their name or moniker.  Where coded or ambiguous language is used herein, I have relied on my training, experience, and knowledge of the investigation, and that of other investigators familiar with the case and/or the RSP Enterprise, to interpret

---

[1] In certain points below, I summarize wire and electronic communications that investigators intercepted pursuant to court orders.  In other points, I quote from or paraphrase agents' understanding of those interceptions.

the statements.  Law enforcement has identified the targets
listed herein as associating with the given monikers, as members
of the RSP Enterprise, and as members of certain RSP Enterprise
cliques based on reviewing communications intercepted during the
Title III wiretap investigation, surveillance, phone records,
law enforcement reports, conversations with the targets
directly, and speaking with investigators who are personally
familiar with the targets.  The investigation remains ongoing.

## VI. <u>SUMMARY OF PROBABLE CAUSE</u>

17.  NANIA, PEREZ, WERTZ, CANO-RODRIGUEZ, ZEPEDA, ORDAZ,
LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and GANDARA
(collectively, the "RICO Conspiracy Targets"), and other members
and associates of the RSP Enterprise conducted, and participated
in the conduct of, the affairs of the RSP Enterprise through the
following means and methods, among others:

a.  NANIA and PEREZ would exercise leadership over
RSP on behalf of the Mexican Mafia from within prison by issuing
rules and orders regarding, among other things, the collection
of taxes, the distribution of controlled substances, the
transfer of firearms, and decisions regarding who held positions
of authority within RSP out on the streets.

b.  NANIA and PEREZ would communicate directly and
through intermediaries with WERTZ, BALANZAR, GIACCO, and TITUS
to give directions regarding the business of RSP.

c.  NANIA, CANO-RODRIGUEZ, PEREZ, ZEPEDA, LOPEZ,
BALANZAR, CASTRO, DURAN, GIACCO, and GANDARA would commit,
attempt to commit, conspire to commit, and threaten to commit

acts of violence to preserve, protect, and expand RSP's criminal operations, to promote and further the activities of RSP, and to enhance their own status within the gang.

d.    NANIA, PEREZ, WERTZ, CANO-RODRIGUEZ, ZEPEDA, ORDAZ, LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and GANDARA would engage in the trafficking of drugs, and would commit robberies and extortion to generate revenue for the enterprise.

e.    CANO-RODRIGUEZ, PEREZ, ZEPEDA, ORDAZ, LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and GANDARA would illegally maintain firearms and ammunition, and would possess, use, and carry, and direct others to possess, use, and carry firearms, in order to commit and threaten acts of violence, including murder and assault, to enforce the authority of RSP, and to further the activities of the enterprise.

f.    WERTZ, CANO-RODRIGUEZ, ZEPEDA, LOPEZ, and CASTRO would extort payments from business owners and others in RSP territory.

g.    Members and associates of RSP would communicate by telephone and social media to share information about, among other things, trafficking in controlled substances, the rules of RSP and the Mexican Mafia, identifying RSP members in good standing, and targeting people who broke RSP and Mexican Mafia rules.

h.    Members and associates of the enterprise would use various techniques to avoid law enforcement scrutiny of the enterprise's criminal activities and to evade and frustrate law

enforcement, such as using coded language to discuss criminal
activities, discarding or switching telephones, using contraband
telephones while incarcerated, evasive driving, notifying
confederates of suspected law-enforcement surveillance, and
other countersurveillance techniques.

18.    In sum, there is probable cause to believe that the
Rancho San Pedro street gang is a criminal enterprise; that the
RICO Conspiracy Targets were employed by or associated with the
RSP Enterprise; and that each of the RICO Conspiracy Targets
knowingly and intentionally agreed and conspired with others to
conduct or participate, directly or indirectly, in the affairs
of the RSP Enterprise through a pattern of racketeering
activity, in violation of 18 U.S.C. § 1962(d).

19.    In addition, there is probable cause to believe that
the RICO Conspiracy Targets knowingly and intentionally joined
an agreement to possess with intent to distribute controlled
substances, including methamphetamine, fentanyl, heroin,
cocaine, and phencyclidine ("PCP"), in violation of 21 U.S.C.
§ 846.

20.    Finally, there is probable cause to believe that
MANDAC violated 18 U.S.C. § 922(g)(1) by unlawfully possessing a
firearm loaded with twelve rounds of 9mm ammunition and an
additional seven rounds of 9mm ammunition after being convicted
of a felony offense punishable by imprisonment for a term
exceeding one year, where the firearm and 19 rounds of
ammunition were all manufactured outside of California.

## VII. <u>TRAINING AND EXPERIENCE ON RACKETEERING OFFENSES</u>

21. Based on my training and experience, as well as my familiarity with investigations conducted by other law enforcement officers into racketeering enterprises, including those engaged in violence, extortion, murder (and similar acts of violence), money laundering, illegal gambling, fraud, financial crimes, and other racketeering activity conducted by criminal enterprises ("Racketeering Activity"), I know the following:

a. Racketeering Activity involves numerous co-conspirators, often organized into a hierarchical structure and operating in a defined territory. Criminal enterprises may operate illegal casinos, sell narcotics, extort others involved in legitimate and illegitimate businesses, launder the proceeds of their illicit activities, commit acts of violence, and engage in other criminal conduct. Criminal enterprise members will often take and share photographs and videos of their illicit activities using their digital devices.

b. Criminal enterprise members often maintain books, receipts, notes, ledgers, bank records, and other records relating to their Racketeering Activity. Such records are often maintained where the criminal enterprise member has ready access to them, such as in their homes, their places of business, in their vehicles, on their persons, and in their cellphones and other digital devices. Additionally, I know that individuals engaged in racketeering enterprises often keep such evidence for long periods of time, including in storage on their digital

16

devices that they keep in close proximity, for extended periods of time, including in their homes, their places of business, and on their persons.

c.    Communications between co-conspirators, as well as from victims of Racketeering Activity, often take place by telephone calls and messages, such as e-mail, text messages, the exchange of photographs and videos, and social media messaging applications, sent to and from cellphones and other digital devices.

d.    Criminal enterprise members often keep the names, addresses, and telephone numbers of those involved in their Racketeering Activity on their digital devices.  Criminal enterprise members often keep records of meetings with associates on their digital devices, including in the form of notes, calendar entries, and location data.

e.    Criminal enterprise members often possess firearms to protect and advance their Racketeering Activity. Criminal enterprise members often keep information regarding their firearms on their digital devices, including contacts that can provide firearms and photographs of firearms they possess and use.

VIII.    <u>**TRAINING AND EXPERIENCE ON ROBBERY AND EXTORTION OFFENSES**</u>

22.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct robbery and extortion investigations, I am aware of the following:

a.    Persons who engage, participate, or are otherwise involved in robberies or extortions generally maintain records of their stolen or extorted items and money and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such as in their places of business or their vehicles or digital devices, including cloud storage accounts within those devices. Particularly in robbery or extortion conspiracies involving multiple robberies, extortions, or co-conspirators, those records are often maintained for long periods of time.

b.    People who participate in robberies or extortions will keep the contact information of co-conspirators or other individuals involved in criminal activities for future use. Such information is also kept on digital devices and in cloud storage.

c.    Individuals involved in robberies or extortions frequently use their cellphones to coordinate with co-conspirators and to research robbery or extortion victims. Cellphones, for example, may be used to set meeting locations, pick routes to the robberies or extortions, coordinate times, and recruit crew members.

d.    Many people also keep mementos from their robberies or extortions, including digital photographs or recordings of themselves possessing items or cash from the robbery or extortion victim.  These photographs and recordings are often shared via social media, text messages, and other applications.

e.    Those who commit robberies or extortions often sell the stolen items or keep them in their possession.  Those who steal or extort cash may launder that money shortly after or make large purchases after the robbery or extortion. Correspondence between persons buying and selling stolen items, laundering money, or making large purchases, often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  That includes sending photographs of the stolen items between the seller and the buyer, as well as negotiation of prices.  In addition, it is common for individuals who engage in robberies or extortions to have photographs of the stolen items, large amounts of cash, or new purchases that they or other individuals working with them possess on their cellphones and other digital devices as they frequently send these photographs to each other to boast of their proceeds, to facilitate sales or transfers of the stolen items or cash, or otherwise discuss the proceeds of the robberies or extortions.

f.    Individuals engaged in robberies or extortions often use multiple digital devices, including digital devices belonging to friends or associates, to minimize the chance of being traced.  Additionally, multiple digital devices are often used for communicating with lookout vehicles and other co-conspirators committing robberies and extortion.

g.    Furthermore, even if a person deleted any digital evidence of robberies and extortion or any other criminal activities, there is still probable cause to believe that there

will be evidence of robberies and extortion in the digital
devices and in cloud storage.  Based on my training and
experience, as well as my conversations with digital forensic
experts, I know that remnants of such digital evidence can be
recovered months or years after they have been deleted from a
digital device.  For example, even if text messages between co-
conspirators surrounding the robbery or extortion are deleted,
evidence that they were communicating at the relevant times and
in the relevant locations may be recovered using forensic tools.

### IX.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

23.  From my training, personal experience, and the
collective experiences related to me by other law enforcement
officers who conduct who conduct firearms investigations, I am
aware of the following:

a.  Persons who possess, purchase, or sell firearms
generally maintain records of their firearm transactions as
items of value and usually keep them in their residence, or in
places that are readily accessible, and under their physical
control, such in their digital devices.  It has been my
experience that prohibited individuals who own firearms
illegally will keep the contact information of the individual
who is supplying firearms to prohibited individuals or other
individuals involved in criminal activities for future purchases
or referrals.  Such information is also kept on digital devices.

b.  Many people also keep mementos of their firearms,
including digital photographs or recordings of themselves
possessing or using firearms on their digital devices.  These

photographs and recordings are often shared via social media,
text messages, and over text messaging applications.

       c.   Those who illegally possess firearms often sell
their firearms and purchase firearms. Correspondence between
persons buying and selling firearms often occurs over phone
calls, e-mail, text message, and social media message to and
from smartphones, laptops, or other digital devices. This
includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price. In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular
phones and other digital devices as they frequently send these
photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

       d.   Individuals engaged in the illegal purchase or
sale of firearms and other contraband often use multiple digital
devices.

### X.   TRAINING AND EXPERIENCE ON DRUG OFFENSES

24. Based on my training and experience and familiarity
with investigations into drug trafficking and gang activities
conducted by other law enforcement agents, I know the following:

a.    Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.    Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.    Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.    Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.    Because drug traffickers often "front" drugs to their customers -- that is, sell the drugs on credit -- or receive drugs from their suppliers on credit, such records are necessary to keep track of the amounts paid and owed by/to their customers and suppliers.  These ledgers are more commonly known as "pay/owe sheets," and may be as simple as notations on miscellaneous pieces of paper or may be recorded more formally in notebooks or even computer spreadsheets.  Pay/owe sheets are frequently encoded and kept on electronic devices, such as cellular phones, in order to protect the identities of customers and suppliers.

f.    Evidence of digital currency, wire transfers, bank accounts, and other evidence of proceeds related to drug trafficking are often electronically stored on drug trafficker's cellular phones and other digital devices.

## XI. <u>STATEMENT OF PROBABLE CAUSE</u>

25.  Unless otherwise noted below, my knowledge of the facts summarized herein is based on my training and experience, my discussion with other investigators, and my review of law enforcement reports, search warrant and subpoena returns, Title III wiretap interceptions, electronic and other written

communications, interviews of certain individuals, and other publicly available documents.

26.   Based on my direct knowledge of the investigation, review of law enforcement reports, conversation with other investigative agents, interviews of RSP members and associates, review of recorded jail calls, review of materials relating to intercepted communications during the Title III wiretap investigation, as well as, conversations with officers who have worked in gang enforcement details investigating RSP and have experience conducting street-level investigations into self-identified RSP members, I am aware of the following in Section A below:

**A.    The Rancho San Pedro Enterprise**

1.   <u>Background and Structure of Rancho San Pedro</u>

27.   RSP is a multi-generational gang that originated in the 1970s, and claims as its territory the city of San Pedro, California. RSP operates under the control of "Mexican Mafia" or "eMe" members from inside California state prisons. The Mexican Mafia is an organized group of individuals that controls much of the distribution of drugs and other criminal activities within California state prisons. Outside of prison, the Mexican Mafia controls many of the Hispanic street gangs in and around Los Angeles, including RSP. Members and associates of street gangs controlled by and/or affiliated with the Mexican Mafia have to pay "taxes" to members and associates of the Mexican Mafia in order to be permitted to maintain control over their territories and to distribute drugs and engage in other criminal activity.

Mexican Mafia leaders direct the activities of RSP from within the California State Prison system, authorize the roles and responsibilities of members within the organization, and exact the Mexican Mafia's portion of the revenues generated from the crimes they commit. In return for RSP's integration into the Mexican Mafia, RSP members receive the Mexican Mafia's protection in the neighborhoods and also in prison.

28.  RSP has a current estimated membership of approximately 500 individuals.  RSP is divided into approximately six subsets or "cliques."  These are "Santa Cruz," "Third Street," "the Locos," "16th Street," and two female cliques, "the Malditas," and "the Locas."  Each clique typically has one or more leader(s) at any given point, commonly referred to as "shot callers," who are responsible for, among other things, managing the drug-trafficking operation in the clique's territory, collecting tax payments from the enterprise's criminal activities for transmission to the Mexican Mafia, enforcing RSP's and the Mexican Mafia's codes of conduct, resolving intra-clique disputes, and representing their respective cliques in discussions with more senior RSP members.

29.  RSP controls its territory through intimidation and acts of violence directed against law enforcement, rival gang members, fellow RSP gang members, and the general public.  Gang members who violate RSP or Mexican Mafia rules are subject to "discipline," that is, assault. Serious violations, such as cooperation with law enforcement, may result in death.

30.  Gang members earn status and respect by committing violent acts.  Additionally, commission of violent acts by RSP members enhances the gang's overall reputation for violence in the community, intimidating rival gangs and citizens in RSP's territory.

31.  The majority of active members of RSP engage in either violent crime or drug trafficking, or both. RSP members who engage in drug trafficking distribute various substances, including methamphetamine, cocaine, PCP, fentanyl, heroin, prescription medication, and other drugs. RSP members and associates work together to successfully operate their drug-trafficking enterprise by (a) supplying drugs to other members of the gang to sell; (b) sharing drug sales so that multiple members of the gang can profit off of a single customer; (c) referring drug customers to other members of the gang when certain members are sold out; (d) "fronting", or providing drugs to other members of the gang with no up-front cost, with the plan to recoup payment after the drugs are sold; (e) traveling together or transporting other gang members to obtain drugs from a supplier; (f) operating drug stash houses and/or drug sales locations for and with other members of the gang; and (g) using common code words to disguise the sales of various drugs and their quantities, such as a "zip" for an ounce and "p" or "package deal" for a pound. RSP members who are not suppliers to the gang generally sell drugs to street-level consumers who visit or live inside the gang's territory.

32.  Based on my training and experience and knowledge of the investigation, I am aware that RSP Enterprise members are required to pay taxes to RSP leadership on all illegal conduct committed, including drug sales.

33.  As long as RSP pays its tax to the Mexican Mafia, RSP members are authorized to sell drugs in RSP-controlled territories. Individual RSP members who sell drugs are required to provide a portion of their drug proceeds to the shot caller of their clique. The shot caller, in turn, will use that money to pay the clique's "rent" to RSP's overall gang leader who, in turn, will pay the Mexican Mafia. Money that a clique member earns for the clique by selling drugs or through other criminal ventures, and contributes to the shot caller, is considered that member's "rent" contribution to the clique.  Earning money for the clique by selling drugs or through other criminal ventures is a way to gain status within RSP, and with the Mexican Mafia.

34.  Based on my conversations with law enforcement tasked to gang details, I am aware that it's difficult for members of criminal street gangs, like RSP, to leave the gang and its activities.  In addition, even if a member of a criminal street gang like RSP stops associating with the gang, evidence of prior gang membership and association, including physical memorabilia and continued contacts, can remain.

    2.   RSP Is a Racketeering Enterprise

35.  The RICO Conspiracy Targets, and others known and unknown, are members of the RSP Enterprise, a criminal organization whose members and associates engage in, among other

things, attempted murder, conspiracy to commit kidnapping, robbery, extortion, and drug trafficking.  The RSP Enterprise operates within the Central District of California and elsewhere.

36.  The RSP Enterprise, including its leaders, members, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce. The RSP Enterprise constituted an ongoing organization whose members and associates functioned as a continuing unit for a common purpose of achieving the purposes of the RSP Enterprise.

37.  The purposes of the RSP Enterprise include, but are not limited to, the following:

a.  Enriching members and associates of the Mexican Mafia through criminal activities, including drug sales, gun sales, robberies, and extortion, as well as the remittance of proceeds generated as a result of RSP's criminal activities (referred to as "taxes");

b.  Preserving, promoting, and protecting the power, territory, and profits of RSP and its members and associates, through threats of violence and actual acts of violence, including robbery, kidnapping, extortion, assault, murder, and attempted murder;

c.  Exposing and punishing RSP members and associates who were perceived to have violated RSP's and the Mexican Mafia's codes of conduct;

d.    Maintaining RSP's control and authority over its territory, often through threats, intimidation, and acts of violence committed against law enforcement, local residents, and rival gangs; and

e.    Violently retaliating against rival gang members or perceived outsiders who challenged RSP's authority or who failed to pay debts owed to RSP members and associates.

38.    Beginning on a date unknown, and continuing to the present, in Los Angeles County, within the Central District of California and elsewhere, the RICO Conspiracy Targets, each being a person employed by and associated with the RSP Enterprise, an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, knowingly and intentionally conspired to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the RSP Enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), which pattern of racketeering consisted of:

a.    Multiple acts involving:

i.    murder, in violation of California Penal Code Sections 21a, 31, 182, 187, 189, and 664;

ii.    kidnapping, in violation of California Penal Code Sections 21a, 31, 182, 207, and 664;

iii. extortion, in violation of California Penal Code Sections 21a, 31, 182, 518, 519, 520, and 664; and

iv.   robbery, in violation of California Penal Code Sections 21a, 31, 182, 211, 212, 212.5, 213, and 664; and

b.   multiple offenses involving drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1) and 846 (relating to the distribution of, possession with intent to distribute, and conspiracy to distribute and possess with intent to distribute controlled substances, including methamphetamine, PCP, fentanyl, heroin, and cocaine).

39.   It was further part of the conspiracy that the RICO Conspiracy Targets agreed that a conspirator would commit, within a period of 10 years, at least two acts of racketeering activity in the conduct of the affairs of the RSP Enterprise.

3.   The RICO Conspiracy Targets Engaged in a Drug-Trafficking Conspiracy

40.   As noted above, a primary purpose of the RSP Enterprise was to enrich members and associates of the Mexican Mafia through criminal activities, including drug sales. Specifically, NANIA, PEREZ, WERTZ, CANO-RODRIGUEZ, ZEPEDA, ORDAZ, LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and GANDARA, conspired and agreed with each other to knowingly and intentionally distribute and possess with intent to distribute significant quantities of methamphetamine, PCP, fentanyl, heroin, and cocaine.

41.   From my own work in the investigation, review of the evidence in this case, and conversations with others investigators involved in this case, I have learned about the

various roles that the targets of the investigation play in the RSP Enterprise, including the following:

42.    To accomplish the objects of the conspiracy:

a.    NANIA and PEREZ would direct the activities of RSP members and associates from jail, would collect taxes from various RSP members and associates from drug trafficking activity, would order physical discipline of RSP members who violated RSP or Mexican Mafia rules or failed to pay taxes from drug proceeds, and would order assaults of non-RSP members and associates who sold drugs in RSP territory.

b.    NANIA would smuggle contraband cellular telephones into prison and distribute them to incarcerated Mexican Mafia members and associates to use to communicate with RSP members regarding drug trafficking and other activities in territory controlled by RSP.

c.    WERTZ would communicate orders on behalf of NANIA regarding drug trafficking activity and collect taxes from various RSP members and associates from drug trafficking activities.

d.    CANO-RODRIGUEZ and ZEPEDA would act as shot callers for RSP cliques, with responsibility over their respective clique's activities, including drug-trafficking, tax collection, control over RSP territory, and for the physical discipline of RSP members for violating RSP or Mexican Mafia rules or failing to pay taxes from drug proceeds.

e.    CANO-RODRIGUEZ, ZEPEDA, and TITUS would obtain drugs to distribute from drug sources of supply.

f.    NANIA, CANO-RODRIGUEZ, PEREZ, ZEPEDA, LOPEZ, BALANZAR, CASTRO, and GANDARA, would provide, and would assist RSP members and associates in obtaining, drugs for further distribution in RSP territory.

g.    WERTZ, CANO-RODRIGUEZ, ZEPEDA, ORDAZ, LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and GANDARA would possess with intent to distribute, distribute, and facilitate the distribution of controlled substances to individual customers in pre-arranged transactions.

h.    CANO-RODRIGUEZ, ZEPEDA, ORDAZ, LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and GANDARA would maintain firearms in order to protect themselves and their drug supply and proceeds, provide protection against rival gang members, and intimidate unauthorized drug dealers doing business in their territory.

i.    PEREZ, TITUS, and CANO-RODRIGUEZ provided, and assisted RSP members and associates in obtaining firearms for use in connection with their drug distribution activities and to protect and control RSP territory.

**B.    Probable Cause for Targets and the Subject Premises and Vehicle**

1.    <u>SALVATORE ANTHONY NANIA</u>

*a.    Background on NANIA*

43.    Based on my review of law enforcement databases, I am aware that NANIA, aka "Crook," aka "C," is currently incarcerated at Centinela State Prison in Imperial County,

serving a sentence on a 1997 conviction for Murder and Assault
with a Firearm, as described below.

44.  I have reviewed NANIA's disciplinary records from
Centinela State Prison, which show possession of a wireless
communication device in 2024, possession of a wireless
communication device component in 2014, constructive possession
of a wireless communication device in 2022, possession of a
wireless communication device in 2021, possession of a cellular
telephone in March and April 2019, possession of a cellular
telephone in 2018, possession of a cellular telephone in 2017,
and possession of heroin in 2016.

45.  Based on my review of NANIA's criminal history, I am
aware that he has California state felony convictions for
murder, assault with a firearm, and assault by a life prisoner.

b.    NANIA's Role in the Enterprise

46.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, NANIA's
disciplinary records and wire calls where RSP members reference
NANIA's status in RSP, and my own participation in the
investigation, I am aware of the following:

47.  NANIA is a high-ranking member of RSP and a documented
Mexican Mafia associate.  For example, I am aware that, in an
intercepted call dated February 15, 2018, NANIA told an
incarcerated co-conspirator in coded language that NANIA
controls the prison yard while the specific Mexican Mafia member
who controls that prison was in solitary confinement.

48.  I am aware that NANIA exercises leadership over RSP from within prison by issuing rules and orders regarding, among other things, the collection of taxes, the distribution of controlled substances, the transfer of firearms, and decisions regarding who held positions of authority within RSP on the streets.  Often, these rules and orders would be issued through WERTZ.

a.  For example, with respect to NANIA's collection of taxes from members of the RSP Enterprise, I am aware that, in an intercepted call dated on or about August 6, 2024, WERTZ said that she was "taxing the smoke shops" and that "Suspect" (i.e., BALANZAR) and "Shadow" (i.e., ZEPEDA) had also been collecting taxes and owed that money to "Crook" (i.e., NANIA).

b.  With respect to control and leadership over the RSP Enterprise's drug-trafficking activities, I am aware that law enforcement intercepted a series of text messages on or about December 14 and 16, 2024, where WERTZ texted CASTRO about a December 10, 2024, law enforcement seizure[2] of drugs and a gun from CANO-RODRIGUEZ's residence.  In the texts, WERTZ stated she was messaging on behalf of NANIA: "Crook wants to know what the hell happened."  In another series of calls and texts dated on or about February 22 through 28, 2018, NANIA agreed to arrange a drug sale of $4,000 of "black," referring to black tar heroin, to an undercover agent ("UC") that NANIA believed was a drug customer and member of RSP.  NANIA coordinated the details of the planned sale from prison using RSP members outside of

---

[2] This seizure is further discussed in paragraph 158.

prison.  Specifically, NANIA told the UC, "We're gonna have to do the transaction in the hood I'll arrange everything" and texted that the UC would meet with "Marty" "from 16," referring to the 16th Street Clique of RSP.

2.  SALVADOR PEREZ

a.  *Background on PEREZ*

49.  Based on my review of law enforcement databases, I am aware that PEREZ, aka "Smokey," aka "Reckless," is incarcerated at Kern Valley State Prison on California state felony convictions for assault with a semi-automatic firearm.

b.  *PEREZ's Role in the Enterprise*

50.  Based on my review of law enforcement reports, conversations with other law enforcement agents, PEREZ's disciplinary records and wire calls where RSP members reference PEREZ's status in RSP, and my own participation in the investigation, I am aware of the following:

51.  PEREZ is a high-ranking member of RSP and a Mexican Mafia associate.  For example, in an intercepted call dated November 26, 2024, TITUS told a coconspirator that PEREZ "runs" San Pedro and that everyone in RSP knows PEREZ and does what he orders.

52.  I am aware that PEREZ exercises leadership over RSP from within prison by issuing rules and orders regarding, among other things, the collection of taxes, the distribution of controlled substances, the transfer of firearms, and decisions regarding who held positions of authority within RSP on the streets.  Often, these rules and orders would be issued through

35

TITUS.  For example, in an intercepted call dated on or about November 25, 2024, TITUS told PEREZ that he would tell an RSP member who was dealing fentanyl that "the homies said you got to pay rent" and that he would collect taxes from the RSP member on behalf of PEREZ.  In addition, I am aware that law enforcement has intercepted multiple calls in December 2024 where TITUS paid PEREZ by providing him with the numbers for a prepaid card.

53.  I am aware that PEREZ has used acts of violence to promote and further the activities of RSP and to enhance his own status in the gang.  For example, on or about September 10, 2011, at approximately 11:55 p.m., PEREZ and two associates approached a victim who was dropping off his friends in RSP territory, asked the victim where they were from, and then shot at the victims.  Based on my training and experience, I am aware that asking someone where they are from is a common way for gang members to ask whether someone is from a rival gang and establish dominance.  PEREZ was later convicted of Assault with a Semi-Automatic Firearm, in violation of California Penal Code § 245(b), in Case Number NA090069, listed above.

54.  With respect to PEREZ's control over the transfer of firearms within RSP to further the Enterprise's activities, I am aware that law enforcement intercepted a call on or about November 26, 2024, in which PEREZ ordered an RSP member to return a firearm to TITUS so that TITUS could use it to perform a task for PEREZ and "the homies."  Based on my training and experience, I am aware that "homies" is commonly used by gang

members to refer to higher ranking gang members, commonly Mexican Mafia associates.

### 3.  DAVID TITUS

#### a.  *Background on TITUS*

55.  Based on my review of TITUS' criminal history, I am aware that he has California state felony convictions for possession of a controlled substance, passing completed checks with intent to defraud, passing fictitious checks, and grand theft.

#### b.  *TITUS' Role in the Enterprise*

56.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own participation in the investigation, I am aware of the following:

57.  TITUS is a member of the Third Street clique of RSP and has the moniker "Criminal."  He conducts drug trafficking to enrich the gang and collects and pays "taxes" from criminal proceeds, including drug trafficking, to PEREZ.  TITUS also possesses and sells firearms.  TITUS lives at **SUBJECT PREMISES 1**.

58.  As part of this investigation, TITUS was intercepted during the Title III wiretap discussing drug trafficking, firearm possession, and the collection and payment of gang taxes.

59.  Communications intercepted on the wire demonstrate TITUS' role as a drug trafficker for RSP.  In several calls, TITUS arranges to purchase drugs for resale from GANDARA. For example, in a call between the two on July 8, 2024, TITUS said

he had a customer with him who wanted "fetty," which I know from my training and experience to refer to fentanyl. GANDARA said he had "it" on him, and arranged to meet with TITUS. From a law enforcement report I am aware that officers conducted surveillance and saw TITUS and GANDARA meet a few hours later in Harbor City. During the meeting, GANDARA handed TITUS an item he had pulled from his sock, and then left on a motorcycle that is registered to GANDARA. LAPD marked units attempted to conduct a traffic stop of GANDARA due to expired registration, but GANDARA fled from law enforcement officers. During the calls, TITUS referred to GANDARA as "Bimbo," a known moniker for GANDARA.

60. As another example, on July 5, 2024, TITUS called GANDARA and complained that TITUS' customer was dissatisfied with the quality of fentanyl that GANDARA had provided. TITUS asked, "Why you switch up on it, why you switch the dope up man?" TITUS said, "You gave, you gave her the boo boo stuff, you didn't give her the good stuff." GANDARA told TITUS to come back and GANDARA would "give [him] the other one." GANDARA said he was at the house. GANDARA and TITUS then discussed whether GANDARA had given TITUS the "white stuff" or the "gray stuff." GANDARA said he did not mean to provide the wrong type, and that he just "had two bags right there like that."

61.  Based on my training and experience, I know that, depending on the quality, fentanyl can vary in its appearance, to include appearing either white or gray.  Based on the intercepted call, when GANDARA asked TITUS if the customer had the "white stuff," I believe that GANDARA was trying to clarify which quality of fentanyl he supplied to TITUS and the customer. Based on my training, experience, and knowledge of the facts of the investigation, I believe that GANDARA is a fentanyl supplier who supplied either "grey" or "white" fentanyl, and that he "had two bags right there like that," meaning that he had two "bags," or quantities of fentanyl available for distribution.

62.  In a call on November 25, 2024, TITUS discussed buying fentanyl.  He told GANDARA that he needed "fetty," which I know from my training and experience is slang for fentanyl.  TITUS wanted to purchase the fentanyl to sell to a customer who TITUS said was with him and was "hurting for dope," in other words, wanted drugs.  TITUS and GANDARA agreed to meet at TITUS's brother's house.

63.  TITUS and GANDARA also discussed liquid Phencyclidine, also known as PCP.  Below is an excerpt from a call on September 19, 2024:

> **GANDARA:** What happened Criminal?
>
> **TITUS:** Nah, I'm here. The clutch is gone on that thing.
>
> **GANDARA:** I told you, I told you it needed a clutch, why, where'd you go?

**TITUS:** I'm here at [unintelligible]. Can you, I'm gonna
need a ride to go, to go get the water at my mom's house.
But how do I lock it up?

**GANDARA:** You can't. Bring it back.

**TITUS:** Oh fuck, okay, alright, I'll bring it back.

64.  Based on my training, experience, and knowledge of
this investigation, I know that "water" is street vernacular for
PCP. I believe that in this conversation TITUS is saying that he
needs a ride to his "mom's house" (which is **SUBJECT PREMISES 1**,
as further explained below) to get PCP because the motorcycle
TITUS was riding was not working.

65.  On September 19, 2024, an unidentified female ("UF")
called TITUS and asked where he was.  TITUS explained that
customers at the Right Step (a hotel) wanted PCP ("sherm"), so
TITUS was going to his mother's house "to get some sherm."  An
excerpt is below:

**TITUS:** Hello?

**UF:** Where are you?

**TITUS:** I went um, the Right Step, 'cause they wanted to buy
some sherm. So, I was gonna go to my mom's house to get
some sherm. So, I stopped here to get the money. You wanna
come…

**UF:** You want me to go back to the room

66.  Based on my training, experience and knowledge of this
investigation, I know that "sherm" is street vernacular for
liquid PCP. I know from my knowledge of this investigation and

conferring with other investigators that "Right Step" refers to the Right Step hotel, a location where TITUS has been seen during surveillance. When TITUS said, "I went um, the Right Step, 'cause they wanted to buy some sherm," I believe that TITUS was referring to going to the Right Step to sell PCP, and that TITUS's statement "So, I was gonna to go my mom's house to get some sherm," reflects that he was storing PCP for sale at **SUBJECT PREMISES 1**.

67.  I know from reviewing reports of investigation and conferring with the involved officers that on September 28, 2024, law enforcement officers went to **SUBJECT PREMISES 1** at approximately 12:30 a.m., due to a belief there was an imminent threat to TITUS's safety, based on intercepted calls where RSP members discussed robbing and kidnapping TITUS. A woman answered the door to **SUBJECT PREMISES 1** and spoke with law enforcement officers regarding the situation. During the conversation, the woman identified TITUS as her son.

68.  Intercepted calls also demonstrate that TITUS and other RSP members would send a portion of their drug sales to RSP.  For example, On November 25, 2024, TITUS, by telephone using coded language, told PEREZ that he would send him money after he sold some "speed."  In a call on November 25, 2024, PEREZ, using coded language, asked TITUS which RSP member was selling fentanyl, and TITUS identified the person as "Weasel." In the call, both agreed that Weasel should be paying taxes on his drug sales, and TITUS said that he would tell Weasel that "the homies said you got to pay rent," and would collect from

Weasel for PEREZ.  In another call on December 4, 2024, TITUS and PEREZ planned for TITUS to collect taxes on drug sales from two fentanyl dealers.

69.    TITUS also possessed and bought and sold firearms. In a call on July 17, 2024, TITUS, by telephone using coded language, agreed to sell a firearm to a firearm customer for $900, and agreed to pay a $50 fee to a co-conspirator who connected him to the customer.

70.    On May 22, 2025, PEREZ placed an outgoing call from California State Prison Kern Valley to TITUS.  I confirmed that PEREZ placed the call to TITUS's number by reviewing Inmate/Ward Telephone System ("ITS") records, which provide details such as the number dialed, as well as the inmate number corresponding to the party placing the call.[3]  During the call, TITUS told PEREZ that he got his car back but his "shit's missing out of it." When PEREZ asked TITUS what was missing, TITUS replied, everything that was in the trunk, including his "clip, my clip to my gun".  Based on my training, experience and knowledge of this investigation, I believe TITUS was telling PEREZ that he had his car stolen and when he got his car back, he was missing items from the trunk, to include the "clip" to his gun. Based on my training and experience, I know that "clip" is street vernacular for magazine and that clip and magazine are used

---

[3] Global Tel Link is a monitoring system for inmate calls in the California state prison system.  The system notifies the party placing the call and the party receiving the call, that the call is subject to recording and monitoring prior to connecting the call.

interchangeably. It is my belief, based on the context of the conversation, that at the time of the call, TITUS was illegally in possession of a firearm and the magazine for his firearm was stolen.

71. I know from my involvement in the search warrant, reviewing reports of investigation, and discussions with other officers, that on December 20, 2024, law enforcement served a federal search warrant at **SUBJECT PREMISES 1**. During the search of the residence and garage, investigators seized a black Glock .40 caliber magazine, 25 live rounds of 12-gauge shotgun ammunition, 39 live rounds of 9m caliber ammunition, four live rounds of .40 caliber ammunition and three live rounds of .380 caliber ammunition.

72. On September 1, 2025, I served administrative subpoena HSI-LA-2025-080655-001, on AT&T, for subscriber information and call detail records/tolls for the telephone number (562)-482-7099[4] (the "-7099 number"), used by TITUS, from August 1, 2025, through September 1, 2025. Between August 1, 2025, and August 31, 2025, there were approximately 192 contacts with telephone number (310) 984-4676 (the "-4676 number") used by BALANZAR, and the -7099 number. Based on TITUS's toll contact with known RSP gang members and drug distributors who are described elsewhere

---

[4] On August 1, 2025, I served administrative subpoena HSI-LA-2025-074177-001, on T-Mobile, for subscriber information and call detail records/tolls for the telephone number (310) 863-0577, used by Robert Titus for the time period of June 1, 2025, to August 1, 2025. I searched the records T-Mobile provided to me in the Cash App payment application. The Cash App payment application indicated that the -7099 number as associated with the name of "David Titus," and the handle "$davidtitus13."

in this affidavit, I believe that there is probable cause to believe that he is continuing to engage in criminal activity.

      *c.   Identification of* **SUBJECT PREMISES 1**

73. On August 26, 2025, the Honorable Teresa Sullivan, Superior Court Judge, County of Los Angeles, signed a warrant authorizing the disclosure of geolocation data for -7099 number, for a period of 30 days. Based on the warrant, conversations with other law enforcement officers, and my participation in the surveillance, I am aware of the following:

    a.  On or about October 2, 2025, investigators queried Accurint, an open-source database, to search for an address for TITUS and one of the addresses listed was 2611 E Washington Street, Long Beach, California 90810 (**SUBJECT PREMISES 1**).

    b.  On September 10, 2025, investigators believed TITUS was at a known location on 5th Street and Pacific Avenue in San Pedro, California, based on his geolocation data, and conducted surveillance. Law enforcement investigators observed TITUS exit a building and enter the driver seat of a car. Investigators conducted mobile surveillance of TITUS throughout San Pedro and Carson. At approximately 8:00 p.m., investigators observed TITUS entering **SUBJECT PREMISES 1** with a key.

    c.  On September 10, 2025, at approximately 8:08 p.m., TITUS's phone was detected within 223 meters of **SUBJECT PREMISES 1** based on geolocation data.

d.   On September 11, 2025, at approximately 4:47 a.m., TITUS's phone was detected within 110 meters of **SUBJECT PREMISES 1** based on geolocation data.

74.   Based on the foregoing, I believe that **SUBJECT PREMISES 1** is the primary residence of TITUS and that evidence of the SUBJECT OFFENSES, as further described in Attachment B, will be found at **SUBJECT PREMISES 1**.

4.   RENE BALANZAR

a.   *Background on BALANZAR*

75.   Based on my review of criminal history records, I am aware that BALANZAR, aka "Suspect," has California state felony convictions for carrying a loaded firearm in public/vehicle, felon/addict in possession of a firearm, attempted murder, and parole revocation.

b.   *BALANZAR's Role in the Enterprise*

76.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own participation in the investigation, I am aware of the following:

77.   BALANZAR is a member of the Locos clique of RSP.  He serves the criminal organization as a narcotics dealer, enforcer, and leader, directing the daily activities of RSP. Based on my training and experience, an "enforcer" is a law enforcement title for a gang member who is tasked with using intimidation and violence to maintain order within the gang and against rival gang members.  Based on my review of BALANZAR's Consolidated Criminal History Reporting System ("CCHRS"), I am aware that BALANZAR has "Rancho San Pedro" tattooed on his back.

45

Based on my training and experience and my knowledge of the investigation, I am aware that getting a RSP tattoo requires permission from members of the RSP Enterprise and is a marker of membership in the RSP criminal street gang.

78.   I am aware that BALANZAR has used acts of violence to promote and further the activities of RSP and to enhance his own status in the gang.  For example, on or about February 3, 2015, at approximately 12:15 a.m., BALANZAR and two associates approached a Westside Wilmas gang member who was walking alone in RSP territory and, after asking him "What's up," began shooting at him. Based on my training and experience, and knowledge of the investigation, I am aware that asking what's up is a common way for gang members to ask whether someone is from a rival gang and establish dominance.  BALANZAR was later convicted of Attempted Murder, in violation of California Penal Code § 664-187(a), in Case Number NA101367, listed above.

79.   As part of this investigation, BALANZAR was intercepted during the Title III wiretap discussing the possession of narcotics for sale. Members of RSP also discussed BALANZAR's possession of firearms and of narcotics for sale, as well as his enforcement of discipline and collection of extortionate taxes.  For example, based on my review of written reports, conversations with other investigators, review of recorded intercepted calls and transcripts, and my own participation, I know the following:

a.   On June 19, 2024, law enforcement intercepted a call from MANDAC to LOPEZ in which MANDAC said: "I thought he

46

[Suspect] was going to sell me a fucking strap, fool." Based on my training and experience and the context of the conversation, I know "strap" to be street vernacular for a firearm, and I believe that MANDAC was stating that he intended to purchase a firearm from BALANZAR.

      b.  On August 6, 2024, an incarcerated coconspirator called BALANZAR and BALANZAR discussed brandishing a firearm during a confrontation with another person at an RSP member's house:

**BALANZAR:** At the end of the day [unintelligible] I seen him at Happy's house fool. And Happy's [unintelligible] little meeting shit and uh, went over there and uh, he tried to reach for his little, little [unintelligible], little [unintelligible] sack, little thing [unintelligible] you know, the little shit that [unintelligible] on [unintelligible]?

[Parties talking over each other]

**COCONSPIRATOR:** Yeah, yeah. His little kangaroo pouch. Yeah.

**BALANZAR:** Yeah fool, I already, I already had, I already had that thing out [unintelligible] and I'm like, do what you [unintelligible] nigga.

[Parties talking over each other]

**COCONSPIRATOR:** John, John Wayne nigga. We on that.

**BALANZAR:** Ah honestly, I was already reaching for it before he even went for it.

[Parties talking over each other]

**BALANZAR:** He was [unintelligible] like. Yeah, he's like, ah man, like. And I was like, man Dizzy would never say [unintelligible]. [Unintelligible].

**COCONSPIRATOR:** On the hood nigga.

**BALANZAR:** Yeah.

**COCONSPIRATOR:** Damn nigga, you by yourself. Bloods.

**BALANZAR:** [Unintelligible] man. I, I, I, I, I got to get my friend in my pocket. It's all good around here.

[Parties talking over each other]

**COCONSPIRATOR:** My best friend huh [laughing].

**BALANZAR:** I got plenty, I got plenty of them, I'm good.

Based on my training, experience, the context of the conversation and knowledge of the investigation, I believe that when BALANZAR said, "Yeah fool, I already, I already had that thing out," he was saying he already had his gun drawn when the other individual in the confrontation reached for their firearm. And BALANZAR stated, "I got to get my friend in my pocket. It's all good around here . . . I got plenty of them," he was saying he has a firearm on him and is not "by himself," as the coconspirator stated.

c.   As discussed above in paragraph 48, law
enforcement intercepted a phone call on August 6, 2024, in which
WERTZ stated that "Suspect" (i.e., BALANZAR) owed NANIA money
from extortionate taxes that BALANZAR and ZEPEDA had collected.

d.   As further discussed below, law enforcement
intercepted a call on September 27, 2024, in which ZEPEDA told
LOPEZ that BALANZAR would go with LOPEZ to rob and extort TITUS
and would bring a firearm with him.  In addition, ZEPEDA told
LOPEZ that TITUS would need to buy the drugs he sells from
BALANZAR moving forward.

80.  In addition, law enforcement has seized controlled
substances, firearms, and indicia of drug-trafficking from
BALANZAR on multiple occasions.  Based on my review of written
reports, conversations with other investigators and my own
participation, I know the following:

a.   On August 29, 2024, LAPD and HSI investigators
conducted a parole-compliance search of BALANZAR in a residence
in San Pedro, California 90731. During the execution of the
search, after law enforcement announced their presence, officers
observed a firearm discarded out of the residence and, shortly
after, BALANZAR attempted to flee the residence. BALANZAR was
subsequently detained by law enforcement. During a search of his
person, law enforcement seized, among other things, 2.90 grams
of fentanyl, 4.15 grams of heroin, 9.30 grams of
methamphetamine, and a handgun holster.  In the house, law
enforcement found multiple digital scales.  Based on my training

and experience, I am aware that drug distributors commonly use scales to measure out controlled substances for sale and often carry more than one type of controlled substance at a time.

b.    On October 1, 2024, LAPD Gang Enforcement Detail Officers were driving in San Pedro when they observed BALANZAR walking next to two parked vehicles where he suddenly stopped. The officers heard a loud metal clank, consistent with the noise a firearm makes when it hits concrete. BALANZAR emerged from behind the parked vehicles and continued walking on the sidewalk. Officers detained BALANZAR knowing he was on active parole, in addition to the belief that he had discarded a firearm. Near where BALANZAR had stopped and turned his body away from the officers, the officers recovered a .380 caliber firearm.  A subsequent NIBIN analysis reflected that the firearm was connected to a shooting.  In addition, BALANZAR possessed 3.92 grams of fentanyl in two plastic baggies and .292 grams of heroin in a third plastic baggie.  In a post-arrest, Mirandized interview, BALANZAR denied knowledge of the firearm and said that the drugs were for personal use.  However, in my training and experience, the possession of multiple controlled substances in separate, packaged baggies is consistent with drug distribution.

81.  Finally, based on my review of BALANZAR's call records, I am aware that BALANZAR continues to frequently

contact other known members of the RSP Enterprise.  On September
1, 2025, I served administrative subpoena HSI-LA-2025-080655-
001, on AT&T, for subscriber information and call detail
records/tolls for a phone number ending in -7099, which is
believed to be used by TITUS, from August 1, 2025, through
September 1, 2025.  Between August 1, 2025, and August 31, 2025,
there were approximately 192 contacts with the -4676 number,
used by BALANZAR, and the -7099 number, used by TITUS.
Accordingly, there is probable cause to believe that BALANZAR's
criminal conduct is ongoing.

> c.  Identification of **SUBJECT PREMISES 8** *and*
>     **SUBJECT VEHICLE 1**

82.  On September 14, 2025, investigators believed BALANZAR
was at a Motel 6 on 9th Street and Centre Street in San Pedro,
California, based on his geolocation data, and conducted
surveillance. At approximately 11:51 a.m., BALANZAR's phone was
detected within 246 meters of the Motel 6 based on geolocation
data. At approximately the same time, investigators observed
BALANZAR enter SUBJECT VEHICLE 1 as a passenger and a woman
believed to be his romantic partner, L.C., entered the driver's
seat of SUBJECT VEHICLE 1, and departed the location.  At 2:25
p.m., investigators observed SUBJECT VEHICLE 1 arrive at the
Motel 6. BALANZAR and L.C. exited the vehicle and walked
upstairs into the Motel 6.

83.  On September 30, 2025, at approximately 3:40 p.m.,
investigators began conducting surveillance on ZEPEDA. At

approximately 5:15 p.m., investigators followed ZEPEDA to
SUBJECT PREMISES 8, which is an America's Best Value Inn. At
approximately 5:20 p.m., investigators observed SUBJECT VEHICLE
1 also at the location. Investigators observed ZEPEDA coming and
going from the counter at the Inn on multiple occasions. At
approximately 5:33 p.m., investigators observed BALANZAR and a
female exit SUBJECT VEHICLE 1 and shortly after enter room 205
of SUBJECT PREMISES 8. At approximately 5:36 p.m., ZEPEDA was
observed by investigators leaving SUBJECT PREMISES 8.

84.  On October 1, 2025, investigators installed a tracking
device on SUBJECT VEHICLE 1, pursuant to a warrant issued on
September 29, 2025, at approximately 3:45 a.m., by the Honorable
Deirdre H. Hill. SUBJECT VEHICLE 1 was parked in the parking lot
of SUBJECT PREMISES 8 when the tracking device was installed.

85.  On October 2, 2025, I reviewed the data associated
with the tracking device on SUBJECT VEHICLE 1 and noted the
following, SUBJECT VEHICLE 1 was stopped near SUBJECT PREMISES 8
at approximately 1:57 a.m. for approximately two hours and
fifteen minutes. At approximately 4:48 a.m., SUBJECT VEHICLE 1
was stopped near SUBJECT PREMISES 8 for approximately six hours
and forty minutes.

86.  On October 3, 2025, I reviewed the data associated
with the tracking device on SUBJECT VEHICLE 1 and noted the
following: SUBJECT VEHICLE 1 was stopped near SUBJECT PREMISES 8
at approximately 1:28 a.m. for approximately three hours and
thirty minutes.  At approximately 5:24 a.m., SUBJECT VEHICLE 1
was stopped near SUBJECT PREMISES 8 for approximately four

hours.  In addition, at approximately 8:56 a.m., BALANZAR's phone was detected within 14 meters of SUBJECT PREMISES 8 based on geolocation data.

87.  Based on the foregoing, I believe that SUBJECT PREMISES 8 is the primary residence of BALANZAR and that evidence of the SUBJECT OFFENSES, as further described in Attachment B, will be found at SUBJECT PREMISES 8.

d.  *Seizure of **SUBJECT DEVICE 2** Used by BALANZAR*

88.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own participation in the investigation, I am aware of the following:

89.  On August 29, 2024, LAPD and HSI investigators conducted a parole-compliance search of BALANZAR at 378 West Sepulveda Street in San Pedro, California 90731. During the execution of the search, BALANZAR, who is a felon, discarded a firearm as he attempted to flee from law enforcement. BALANZAR was subsequently detained by law enforcement and a search of his person was conducted. During the search of his person, law enforcement seized, among other things, 4.152 grams of a mixture and substance containing a detectible amount of heroin, approximately 2.98 grams of a mixture and substance containing a detectible amount of fentanyl, approximately 9.12 grams of methamphetamine, and a handgun holster.  Officers also seized **SUBJECT DEVICE 2**, which was recovered from the bedroom that also contained glasses that appeared to belong to

him based on previous surveillance where he was wearing glasses and miscellaneous documents addressed to him.

90.   Based on the foregoing description of BALANZAR's involvement in RSP operations and the Subject Offenses, the government seeks authorization to search SUBJECT DEVICE 2 for evidence of the Subject Offenses.

    5.   JOSE VICENTE CASTRO

    a.   *Background on CASTRO*

91.   Based on my review of CASTRO's criminal history, I am aware that he has a felony conviction for Possession with Attempt to Distribute Methamphetamine and Conspiracy to Possess With Attempt to Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B), and 846, in case number CR 11-322-JFW (C.D. Cal.), on or about April 10, 2012.  CASTRO also has state misdemeanor convictions for Assault with a Deadly Weapon and Possession of Burglary Tools in 2010 and 2011, respectively.

    b.   *CASTRO's Role in the Enterprise*

92.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own participation in the investigation, I am aware of the following:

93.   CASTRO is an RSP member who uses the moniker "Rojo." CASTRO is a drug broker for the benefit of the RSP gang. As part of this investigation, CASTRO was intercepted during the Title III wiretap discussing drug trafficking, firearm possession, and kidnapping with intent to murder.

94.    CASTRO is involved in drug trafficking for the benefit of RSP.  CASTRO coordinates with RSP members, including CANO-RODRIGUEZ, LOPEZ, and ZEPEDA, to find customers and sources of supply.  For example, based on my review of intercepted calls, I know the following:

95.    On June 21, 2024, LOPEZ, using the -1333 number, made an outgoing call to CASTRO, using the -6544 number, at approximately 2:45 p.m. The following occurred:

> **CASTRO:** Hello.
>
> **LOPEZ:** What's up foo?
>
> **CASTRO:** What's up foo?
>
> **LOPEZ:** Nuttin. I need a dub. My little homie needs a dub right here.
>
> **CASTRO:** You gonna come to the house?
>
> **LOPEZ:** I don't have no wheels right now. Perro, he came to me. So [unintelligible] he liked your stuff, so…
>
> **CASTRO:** Yeah. Uh. Fuckin uh alright Ima drop it off now. Yeah, yeah. At your house right?
>
> **LOPEZ:** Yeah. Yeah. Just pull up in the parking lot.
>
> **CASTRO:** Alright.
>
> **LOPEZ:** Alright perro.
>
> **CASTRO:** Alright. Late.

c.    Based on my training, experience and knowledge of this investigation, in this call, LOPEZ and CASTRO appear to be

discussing the sale of twenty dollars' worth of narcotics. Based on training and experience, I know a "dub" to be street vernacular for twenty dollars' worth of narcotics, typically methamphetamine, cocaine, heroin, or fentanyl. I further believe CASTRO agreed to deliver the narcotics to LOPEZ when he stated, "Yeah. Uh. Fuckin uh alright Ima drop it off now. Yeah, yeah. At your house right?"

96.   In a series of calls in mid-September 2024, CASTRO asked LOPEZ for a pound of drugs to "front" a drug customer, who would later pay $500. Based on my training and experience in drug trafficking investigations, I am aware that a drug supplier will often provide drugs to a dealer who will then pay for the drugs after making a sale.  LOPEZ arranged for a pound of narcotics to be sourced by ZEPEDA for CASTRO to provide to the drug customer. In follow-up calls, CASTRO, LOPEZ, and ZEPEDA discussed the customer's failure to pay for the drugs and the need to repay ZEPEDA the cost of the drugs.  On September 20, 2024, in a series of telephone calls using coded language, LOPEZ told ZEPEDA that he had confiscated CASTRO's firearm; ZEPEDA replied that CASTRO would get his gun back when the customer had paid and told LOPEZ that he was on his way to pick up the firearm.

a.   An excerpt of one of the calls from September 16, 2024, between CASTRO and LOPEZ, is below.  The exchange occurred in English and Spanish:

**LOPEZ:** Hello?

**CASTRO:** How's it going? Hey dude. Do you have the uh-uh-the [stutters] the P?

**LOPEZ:** It's on its way.

**CASTRO:** That if you have the P?

**LOPEZ:** What do you mean?

**CASTRO:** The P.

**LOPEZ:** What about it?

**CASTRO:** Do you have it?

**LOPEZ:** Umm… I haven't called him.

**CASTRO:** Because uh… [unintelligible] is fucking uh… he's calling me and calling me [unintelligible] fool. He said that uh… that most likely he'll have five— five for us tomorrow.

[Overlapping conversation]

**LOPEZ:** I mean—let me- get—let me… let me call him-- let me call the homie real quick.

**CASTRO:** Yeah.

**LOPEZ:** What are you doing?

**CASTRO:** Because he wants—he wants to come pick it up.

   b.   Based on my training, experience, context of the conversation and knowledge of this investigation, in this call, LOPEZ and CASTRO appear to be discussing the sale of a pound of narcotics. Based on training and experience, I know a "p" to be a term commonly used to refer to a pound of methamphetamine.

Furthermore, I believe CASTRO was telling LOPEZ in this call that the buyer of the pound of methamphetamine would have $500 for them when he stated, "He said that uh… that most likely he'll have five— five for us tomorrow."

97.  On October 5, 2024, LOPEZ and CASTRO went to ZEPEDA's residence on West 15th Street in San Pedro, in RSP territory, where LOPEZ called ZEPEDA to ask where to find a scale to weigh a pound of drugs.

98.  On November 28, 2024, CASTRO, in a series of text messages using coded language, notified multiple people that he was restocked with drugs for sale.

99.  On December 4, 2024, CANO-RODRIGUEZ, by telephone using coded language, said that he had drugs to sell and asked if CASTRO knew anyone looking to buy.

100. On December 14, 2024, CASTRO, by text message using coded language, told LOPEZ that he was restocked with drugs, and said that LOPEZ should get some from him before he ran out.

101. On December 14, 2024, CASTRO, by text message and telephone using coded language, offered to sell a drug customer half an ounce of drugs for $40 and said that he would sell an additional ounce for $100.

102. CASTRO also possessed firearms.  For example, on September 18 and 19, 2024, in a series of telephone calls and text messages using coded language, ZEPEDA demanded that LOPEZ and CASTRO collect payment from the drug customer who had been fronted a pound of drugs so that ZEPEDA could pay his supplier;

LOPEZ said that CASTRO would provide his handgun as collateral
for the debt.  On September 20, 2024, in a series of telephone
calls using coded language, LOPEZ told ZEPEDA that he had
confiscated CASTRO's firearm; ZEPEDA replied that CASTRO would
get his gun back when the customer had paid and told LOPEZ that
he was on his way to pick up the firearm.  Based on my training,
experience, and knowledge of this investigation, I know that it
is common to collect collateral, such as a firearm, when an owed
debt is not paid. In this instance, ZEPEDA fronted CASTRO
narcotics and that individual had not yet paid CASTRO. As a
result, ZEPEDA confiscated CASTRO's gun so that he could either
sell it to make up for the money owed to his supplier or give it
to the supplier.

        a.   Finally, CASTRO was involved in planning a
kidnapping.  In a series of calls on December 12, 2024, CASTRO
and CANO-RODRIGUEZ discussed another RSP member.  From my review
of these calls and discussions with other investigators familiar
with RSP, I believe CANO-RODRIGUEZ and CASTRO suspected a RSP
member was cooperating with law enforcement and had informed the
police that CANO-RODRIGUEZ had drugs and guns at his house.  In
fact, law enforcement had recently searched CANO-RODRIGUEZ's
house and found a large amount of methamphetamine inside a
backpack, along with a loaded firearm.  This search, and the
seizure of drugs and a gun from CANO-RODRIGUEZ's house, is
discussed in further detail below.

    103. In the ensuing conversation, which was in both English
and Spanish, CASTRO and CANO-RODRIGUEZ strategized about pinning

the drugs and gun on this RSP member; CANO-RODRIGUEZ would tell the police that this RPS member used to use CANO-RODRIGUEZ's car.  They agreed that the only way the plan would work is if the RSP member was "already dead."  CASTRO told CANO-RODRIGUEZ, "No, that's—that's easy dude. I can pick him up dude. I—I can take him with me," to which CANO-RODRIGUEZ responded, "And where are you going to take him dude?" CASTRO stated, "To the desert dude" then later states, "I'll get—I'll get a car… that's not mine." Based on my training and experience, I believe that when CASTRO said he would take the RSP member to the "desert" and that he would get a car that does not belong to him, he did not want the evidence to be traced back to him.  Law enforcement located and warned the RSP member of this possible threat to his life.

104. On September 20, 2024, CASTRO, by telephone using coded language, told LOPEZ that a rival gang had vandalized an area within RSP territory; LOPEZ and CASTRO discussed whether any RSP members had crossed out the graffiti and agreed to go to the area to do it themselves.

105. On December 5, 2024, CASTRO, by telephone using coded language, agreed with a co-conspirator that no gang member is allowed to snitch to law enforcement about another gang member, describing it as the "code" and applicable to "everybody that is playing the game."

106. On December 6, 2024, CANO-RODRIGUEZ, by telephone using coded language, told CASTRO to collect money from WERTZ to pay a Mexican Mafia member.

107. On December 17, 2024, CANO-RODRIGUEZ, by telephone using coded language, told CASTRO that a "green light" had issued for an RSP member who had been caught possessing child pornography, and that CASTRO would have to kill the RSP member if he saw him.

   c.    *Identification of* **SUBJECT PREMISES 2**

108. On August 26, 2025, the Honorable Teresa Sullivan, Superior Court Judge, County of Los Angeles, signed a warrant authorizing the disclosure of geolocation data for the -4420 number, for a period of 30 days. Based on the warrant, conversations with other law enforcement officers, and my participation in the surveillance, I am aware of the following:

   a.    On or about October 2, 2025, investigators queried Accurint to search for an address for CASTRO and one of the addresses listed was 1530 South Gaffey Street, San Pedro, CA 90731 (**SUBJECT PREMISES 2**).

   b.    On September 1, 2025, at approximately 12:03 p.m., CASTRO's phone was detected within 28 meters of **SUBJECT PREMISES 2** based on geolocation data.

   c.    On September 11, 2025, at approximately 6:22 a.m., CASTRO's phone was detected within 16 meters of **SUBJECT PREMISES 2** based on geolocation data.

   d.    On September 11, 2025, investigators conducted surveillance at **SUBJECT PREMISES 2**, based on geolocation data of CASTRO's phone. At approximately 2:10 p.m., investigators observed CASTRO exit **SUBJECT PREMISES 2** to retrieve the mail.

CASTRO was then observed entering a car and departing **SUBJECT PREMISES 2**.

      e.  On September 11, 2025, at approximately 2:08 p.m., CASTRO's phone was detected within 16 meters of **SUBJECT PREMISES 2** based on geolocation data.

      f.  On September 16, 2025, at approximately 4:13 p.m., I observed the car CASTRO was surveilled using on September 11, 2025, parked at **SUBJECT PREMISES 2**.

      g.  On September 16, 2025, at approximately 4:10 p.m., CASTRO's phone was detected within 22 meters of **SUBJECT PREMISES 2** based on geolocation data.

109. Based on the foregoing, I believe that **SUBJECT PREMISES 2** is the primary residence of CASTRO and that evidence of the SUBJECT OFFENSES, as further described in Attachment B, will be found at **SUBJECT PREMISES 2**.

      6.  <u>VICTOR RENEE ZEPEDA</u>

      a.  *Background on ZEPEDA*

110. Based on my review of ZEPEDA's criminal history, I am aware that he has state felony convictions for threatening a crime with intent to terrorize; assault with a deadly weapon and great bodily injury; and battery with serious bodily injury.

      a.  *ZEPEDA's Role in the Enterprise*

111. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own participation in the investigation, I am aware of the following:

112. ZEPEDA is an RSP member who uses the moniker "Shadow." ZEPEDA serves the gang as a drug trafficker, and is a source of

drug supply for other RSP members to sell to customers. From viewing criminal history records, I am aware that ZEPEDA has "RSP" tattooed on his neck and his clique "Santa Cruz" tattooed on his arm.

113.   As part of this investigation, ZEPEDA was intercepted during the Title III wiretap discussing drug trafficking, collecting a firearm as collateral for a drug debt, online gambling, and conspiracy to commit armed robbery and assault.

114. Examples of ZEPEDA's criminal conduct during the investigation of RSP include the following:

115. On September 17, 2024, ZEPEDA and LOPEZ, in a series of text messages using coded language, planned to sell a pound of drugs to a buyer for $650, and ZEPEDA vouched for the quality of the drugs.

116. On September 23, 2024, LOPEZ called ZEPEDA at approximately 10:54 p.m. The following is an excerpt of the conversation:

> **ZEPEDA**: Unless you fools can find some to get off these pounds, I got more of them, you feel me
>
> **LOPEZ**: Ya, well ya well ya but, ya ya but, I told him he fu that dude fucked us off 'cause you know [unintelligible] I told him he has more but after this I don't think he is gonna want to fuck with you after this
>
> **ZEPEDA**: [Unintelligible] money up front but
>
> **LOPEZ**: Ya Money up front right right

**ZEPEDA:** But um I'm saying if you know anybody else [unintelligible]

**LOPEZ:** Ya ya ya ya ya ya, I'll I'll I'll, I'm I'm I'ma I'ma keep that in consideration and I'll take a looking into that right now for you

**ZEPEDA:** $750 is a steal I'm telling you

**LOPEZ:** Ya ya ya

**ZEPEDA:** Ain't nobody goin get that that shit that cheap

**LOPEZ:** Ya and its good and its good too [unintelligible]

**ZEPEDA:** I got I got some other shit too now

**LOPEZ:** Oh ya, shards?

**ZEPEDA:** Yup

**LOPEZ:** Mmmm…

**ZEPEDA:** I have shards now

**LOPEZ:** Oh I'm have to check that out

117. Based on my training, experience and knowledge of this investigation, I believe in this call ZEPEDA and LOPEZ are discussing the sale of methamphetamine. I believe that when ZEPEDA told LOPEZ, "Unless you fools can find some to get off these pounds, I got more of them, you feel me," he was asking LOPEZ to find a customer to buy the "pounds" of methamphetamine from ZEPEDA, as he had more. When ZEPEDA told LOPEZ, "money up front," he was saying that the pounds of methamphetamine would have to be paid for at the time of sale. When ZEPEDA told LOPEZ, "$750 is a steal I'm telling you," ZEPEDA was saying that $750 was a good price per pound for methamphetamine. Further, based on my training, experience, and conversations with other law

enforcement investigators, I know that "shards" is a term that may be used to refer to high quality methamphetamine, which can appear to look like shards of broken glass. I also know that "$750" per pound is consistent with the street price of methamphetamine per pound in the Los Angeles area.

118. On September 27, 2024, ZEPEDA, in a series of telephone calls using coded language, spoke with LOPEZ about TITUS selling heroin out of a motel in RSP's rival gang Wilmas's territory, and ZEPEDA and LOPEZ discussed repercussions the RSP member would face.

119. Based on my review of law enforcement reports and my conversations with other investigative officers, I am also aware that, on October 5, 2024, in a series of intercepted telephone calls using coded language, ZEPEDA discussed the distribution of narcotics and was referenced by other RSP members regarding his distribution of narcotics.  For example:

a.    On October 5, 2024, LOPEZ, by telephone using coded language, told CANO-RODRIGUEZ that he needed a pound of drugs for a drug customer; CANO-RODRIGUEZ said that he had only a half pound and told LOPEZ to contact ZEPEDA.

b.    On October 5, 2024, ZEPEDA, in a series of telephone calls using coded language, agreed to supply LOPEZ with a pound of drugs to sell, saying that he had three pounds at his house, and that LOPEZ and CASTRO could weigh out a pound and could pay him for the drugs after the sale was complete.

c.    On October 5, 2024, LOPEZ and CASTRO went to ZEPEDA's residence on West 15th Street in San Pedro, in RSP

territory, where LOPEZ called ZEPEDA to ask where to find a scale to weigh the pound of drugs.

120. ZEPEDA also trafficked in firearms.  For example, I have reviewed text messages from a digital device search in which ZEPEDA sent a buyer photographs of four firearms along with a price.

### b.    Identification of **SUBJECT PREMISES 3**

121. Based on my conversation with an LAPD officer, I am aware that ZEPEDA provided the address of the **SUBJECT PREMISES 3** during a field interview in March 2025.  In addition, on September 19, 2025, I served administrative subpoena HSI-LA-2025-084210-001, on AT&T, for subscriber information for phone number (310) 435-6626 number and learned the -6626 number is subscribed to ZEPEDA at **SUBJECT PREMISES 3**, and that the -6626 number was active since June 21, 2025.

### 7.    JOSEPH DOMINIC GIACCO

### a.    Background on GIACCO

122. Based on my review of criminal history records, I am aware that GIACCO, aka "Spanky, has state felony convictions for Possession of a Controlled Substance While Armed; Carrying a Loaded Firearm; Receiving Known Stolen Property; Appropriating Lost Property; Possession of a Controlled Substance While Armed; Possession of a Controlled Substance For Sale; Felon in Possession of a Firearm; Transporting a Controlled Substance, False Imprisonment; Possession of a Controlled Substance For Sale; Felon in Possession of a Firearm; Conspiracy to Commit Felony, Gang; and Possession of a Controlled Substance For Sale.

b.   *GIACCO's Role in the Enterprise*

123. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own participation in the investigation, I am aware of the following:

124. GIACCO is a convicted felon and member of the 16th Street clique of RSP. GIACCO serves the criminal organization as a narcotics dealer for RSP. Based on my review of GIACCO's CCHRS I am aware that GIACCO has "RSP" tattooed on his stomach, "RSP" tattooed on his back, and "HA," which stands for "Harbor Area" tattooed on his arm and behind his ear.  Based on my knowledge of the investigation, "Harbor Area" refers to the general geographic area the territory of RSP is in, since RSP is from the Harbor Area of Los Angeles.

125. Based on my review of phone calls intercepted during the Title III wiretap, I am aware that GIACCO has used firearms to intimidate rival gangs and promote and further the activities of RSP.  Specifically, I reviewed an intercepted call on June 21, 2024, in which TITUS told PEREZ that he gave GIACCO a firearm after GIACCO had been fired on by a rival gang, stating, "I let him I let him borrow my strap."  When asked what kind of gun TITUS gave to GIACCO, TITUS replied, "Forty-five."  In an intercepted call on June 22, 2024, PEREZ, BALANZAR, GIACCO, and TITUS discussed picking up and selling the firearm that TITUS had given to GIACCO.  In the call, PEREZ agreed to arrange for a "homie" to bring a different gun to GIACCO, in case GIACCO needed to use it against members of a rival gang, saying: "Ima holla at the homie and Imma get one for you bro.  I'm telling

you, I got you." PEREZ also told GIACCO, "I thought I've been hearing you doing your shit. So, I didn't know you were out there naked." Based on my training and experience and knowledge of the investigation, I understand PEREZ to be saying that he had heard that GIACCO was completing tasks for RSP and assumed that GIACCO had his firearm while doing those tasks. GIACCO responded to PEREZ that he "had two already [unintelligible], other episode, but you already know how that shit, how that shit went down." Based on my training and experience and knowledge of the investigation, GIACCO appears to be referring to his possession of two guns that were seized during a law enforcement search on February 14, 2024.

126. In addition, I have reviewed law enforcement reports, spoken with other investigative officers, and reviewed phone calls intercepted during the Title III wiretap in which GIACCO discusses his possession of narcotics for sale and possession of firearms to protect his drug-trafficking activity. For example:

a. On February 13, 2024, a RSP coconspirator placed a recorded outgoing call from California State Prison Solano to GIACCO in which GIACCO told the coconspirator, "I got a grip of that other shit, that white girl shit." Later in the call, GIACCO said that "[w]e have crack heads coming to the door." Based on my training and experience and knowledge of the investigation, I understand "that white girl shit" and "crack heads" to refer to GIACCO's sales of cocaine. In the same call, GIACCO also said, "I'm sitting on like like two of them things." The coconspirator offered to "try and get rid of some of that"

and said he was "down like 6 right now." Based on my training and experience and knowledge of the investigation, I understand "them things" to refer to firearms and the coconspirator to be offering to help GIACCO sell the firearms. The day after this call, law enforcement executed a search warrant at GIACCO's and DURAN's residence and seized a loaded handgun from a hallway closet, approximately 14 grams of suspected fentanyl from GIACCO's person, a firearm and approximately 2 grams of suspected methamphetamine from a bedroom believed to be GIACCO's bedroom, and a loaded firearm magazine and approximately 5 grams of suspected cocaine from a bedroom believed to be DURAN's bedroom. During law enforcement surveillance of GIACCO's and DURAN's residence, prior to the execution of the search warrant, two male individuals exited the house and approached the undercover surveilling officer and the officer then heard gunshots that he believed were shot by the two individuals to scare him away from the house where the drugs and firearms were being kept.

        b.    On August 12, 2024, at 12:51 p.m., law enforcement intercepted a call to GIACCO where the unidentified female caller ("UF") asked for "a half" for "fifty bucks" and GIACCO responded, "A half ounce? OK, um . . . fuck. Let me see. Give me like 15-20 minutes." At 2:04 p.m., GIACCO texted the number of the UF.[5] At 2:05 p.m., GIACCO, received a call from an

---

        [5] Investigators were not able to monitor these messages because interception of electronic communications had not yet been authorized for the phone that GIACCO was using. Based on my *(footnote cont'd on next page)*

unidentified male caller ("UM") who identified as an associate of the UF.  The UM confirmed the sale for "half an ounce" for $50.  GIACCO confirmed that the UM should pay by CashApp and encouraged the UM to hurry to meet for the deal.

c.    On August 23, 2024, law enforcement intercepted a call in which GIACCO asked WERTZ to supply him with fentanyl for him to re-sell to a drug customer.  The following is an excerpt of the conversation during that call:

**GIACCO:** You have any fetty still?

**WERTZ:** Yeah.

**GIACCO:** My homie needs some I don't know, like a half I think or some shit.

**WERTZ:** Okay.

Based on my training, experience, and knowledge of this investigation, I know "fetty" to be coded language used by narcotics traffickers and users alike to identify fentanyl. As the conversation on the intercepted call continued, GIACCO clarified that the customer wanted to purchase only half a gram. WERTZ was not willing to deliver the smaller amount of fentanyl.

*c. Identification of **SUBJECT PREMISES 5***

127. On September 8, 2025, the Honorable Stephen A. Marcus, Superior Court Judge, County of Los Angeles, signed a warrant authorizing the disclosure of geolocation data for a cellphone associated with GIACCO ending in -4206, for a period of 30 days. Based on the warrant, conversations with other law enforcement

---

training, experience, and knowledge of this investigation, I believe that in these text messages, GIACCO was attempting to set up the sale of the half-ounce of narcotics.

officers, and my participation in the surveillance, I am aware of the following:

      a.   Investigators observed that GIACCO's phone was detected in the vicinity of First Street, Grand Avenue and Santa Cruz in San Pedro, California. On or about October 2, 2025, investigators queried Accurint to search for an address for GIACCO and one of the addresses listed was 132 North Grand Avenue, Apartment D, San Pedro, California 90731 (**SUBJECT PREMISES 4**).

      b.   On September 16, 2025, investigators conducted surveillance on **SUBJECT PREMISES 4**, based on the geolocation data of GIACCO's phone, indicating he was travelling in the direction of **SUBJECT PREMISES 4**. At approximately 3:55 p.m., investigators observed GIACCO go through the pedestrian gate that leads to **SUBJECT PREMISES 4**. At approximately the same time, GIACCO's phone was detected by cell-site data within 223 meters of **SUBJECT PREMISES 4**. On September 18, 2025, at approximately 7:12 p.m., GIACCO's phone was again detected within 300 meters of **SUBJECT PREMISES 4**.

128. Based on the foregoing, I believe that **SUBJECT PREMISES 4** is the primary residence of GIACCO and that evidence of the SUBJECT OFFENSES, as further described in Attachment B, will be found at **SUBJECT PREMISES 4**.

      8.   <u>ANGELICA WERTZ</u>

      a.   *Background on WERTZ*

129. Based on my review of criminal history records, I am aware that WERTZ, aka "Dizzy," has state felony convictions for

Possession of a Controlled Substance While Armed; Possession of Cocaine Base for Sale; Prohibited Possession of a Firearm; Possession of a Controlled Substance for Sale; and Vehicle Theft.

### b.    WERTZ's Role in the Enterprise

130. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

131. WERTZ is a convicted felon and member of the Locas clique of RSP with the moniker "Dizzy." WERTZ serves the criminal organization as a narcotics dealer, collecting extortionate taxes and, at times, acting as the secretary for NANIA. Based on my review of WERTZ's CCHRS, I am aware that WERTZ has "San Pedro" tattooed on her neck, which indicates affiliation with the RSP Enterprise.  In addition, I conducted an open search for WERTZ's profile on Facebook and identified the profile "Dizz Ranch" based on her profile picture and having met her in person in an attempted interview. Based on my knowledge of the investigation, I understand "Dizz Ranch" to be a combination of her moniker and affiliation with the RSP Enterprise.

132. I have reviewed calls intercepted during the authorized Title III wiretap where WERTZ discusses her possession of narcotics for sale and collecting extortionate taxes and payment on behalf of the RSP Enterprise.  For example:

a.   With respect to the collection of extortionate taxes and payments, as discussed above in paragraph 48, law

enforcement intercepted a phone call on August 6, 2024, in which
WERTZ stated that she was "taxing smoke shops" for NANIA and had
taught BALANZAR and ZEPEDA to tax smoke shops.  The following is
an excerpt of the conversation during that call:

**WERTZ:** Well, the ones I am going at it with kind of does.

**GIACCO:** Who? Who, who are you going at it with?

**WERTZ:** Fucken Suspect.

**GIACCO:** For what?

**WERTZ:** Cause. Okay, look. We were like, you know how we
were like taxing the um, the smoke shops and everything.

**GIACCO:** Mmm hmm.

**WERTZ:** So they fucken, they fucken um, they fucken started
like going like and doing, like we put them up on it. Like
me, Crook and Tank. We're the ones that like put them up on
that shit, right?

**GIACCO:** Yeah.

**WERTZ:** Like when he got out. Cause I'm the one that told
them, 'Hey that's my homeboy. Like put him on. Like put him
up on that.' Like, you know?

**GIACCO:** Mmm hmm.

**WERTZ:** And fucken um so, so they did. And so now he, he's
going around, now he went and did his own. Like he's like,
he's his own little court right now. Like he's pretty
insulting. Like today he told me, aye 'I'm not fucking with
Crook and Tank no more.' Cause the last time that we did
one of those things, like they tried to take like I guess
supposedly, he told me that like they tried to, they tried

73

to like take, take most of the money. I don't know. Take
most of the money or whatever. But the thing is, that's not
how it goes. Like, so I don't know. Crook was dealing with
that shit. Talking, talking to them about that right?

**GIACCO:** Mmm hmm.

**WERTZ:** And he, he kinda like put him up too much on game,
on like what to do. So now they went and I guess now
they're just taking the money for themselves. Like him and
his little posse. Like Shadow, him, um Knuckles, and
Suspect. So, it's I don't know. It's just a big ass deal
right now.

[Break in Transcript]

**WERTZ:** Yeah. Today, cause I went over. I went over. Cause I
haven't been doing it cause you know like, I'm like, I'm
hot and I try not to do that stuff or whatever.

**GIACCO:** Yeah.

**WERTZ:** And um, fucken today I went finally today cause you
know, there was supposed to be a pickup today, and fucken
we went and then Suspect had already got it. So now were on
the phone. I was on the phone with the person that works
there at the smoke shop, the smoke shop or whatever.

**GIACCO:** Yeah. Yeah.

**WERTZ:** And fucken um and then I put Old, I put C on the
phone then he, she was like, like she told us that Shadow
and Suspect came to get it, and then Shadow gets on the
phone and he's like, 'Oh um,' he goes, 'Oh um, we already
picked it up and it already got sent to who it's supposed

74

to." I'm like well no, I'm like no it didn't. And then
they're like. And I'm like, and then I was like here, talk,
C said to call him. Said, 'Okay, tell him I'm going to call
him right now.' Like I don't know. It's just fucken, you
know?

b.    During this call, WERTZ discussed having issues
with RSP members "Suspect," who investigators know to be
BALANZAR; "Shadow" who investigators know to be ZEPEDA, and a
third person identified as "Knuckles." WERTZ explained that she
had been "taxing" smoke shops and stated that BALANZAR, ZEPEDA,
and "Knuckles" had cut her out of the taxing. In this call,
WERTZ told GIACCO that she went to collect because "there was
supposed to be a pickup today," but BALANZAR and ZEPEDA had
already collected the taxes. WERTZ further told GIACCO that she
had a direct line of communication to the Mexican MAFIA
associated who sanctioned the extortion activity, stating "I
really do talk to the main mains."

c.    I believe, based on my training, experience, and
knowledge of this investigation, in this conversation, WERTZ was
admitting that she collects "taxes" from "smoke shops" located
with RSP territory. I know "taxing" refers to the practice of
extorting money from businesses conducting criminal activity
within at the direction of and for the benefit of the Mexican
Mafia. I know that smoke shops, i.e. tobacco shops, are
frequently used as a front to conduct illegal gambling activity
and sell narcotics. When WERTZ stated that she went to collect
taxes because there was "supposed to be a pickup" she was

referring to a pickup of money for delivery to Mexican Mafia members. When WERTZ said she talks to the "main mains" she was indicating that she has status with the Mexican Mafia.

d.    With respect to WERTZ's control and leadership over RSP Enterprise's drug-trafficking activities on behalf of NANIA, as discussed above in paragraph 48, WERTZ texted CASTRO after a law enforcement seizure of drugs and a gun from his residence and told him that "Crook wants to know what the hell happened."  In an additional intercepted call on August 23, 2024, discussed above in paragraph 126(c), WERTZ coordinated drug-trafficking with other members of the RSP Enterprise by discussing providing GIACCO with fentanyl to sell to a customer and ultimately declining because the amount of fentanyl requested was too small.

133. Based on my review of law enforcement reports and conversations with investigating officers, I am aware that WERTZ also would use firearms and threats of violence to promote and further the activities of RSP and to enhance her own standing in RSP.  For example, on February 10, 2025, WERTZ, at a residence on 7th Street in San Pedro, California in RSP territory, pounded on the door of the residence, and attempted to gain entry as part of an apparent robbery attempt by falsely claiming that she was an agent of the Federal Bureau of Investigation while brandishing a firearm.

c.    Identification of **SUBJECT PREMISES 5**

134. On September 17, 2025, the Honorable Kathleen Blanchard, Superior Court Judge, County of Los Angeles, signed a

warrant authorizing the disclosure of geolocation data for the telephone number (310) 461-9573[6] (the "-9573 number"), for a period of 30 days. Based on the warrant, conversations with other law enforcement officers, and my participation in the surveillance, I am aware of the following:

a. On or about October 2, 2025, investigators queried Accurint to search for an address for WERTZ and one of the addresses listed was 762 West 30th Street, Apartment 11, San Pedro, California 90731 (**SUBJECT PREMISES 2**).

b. On September 17, 2025, at approximately 1:52 p.m., WERTZ's phone was detected within 27 meters of SUBJECT PREMISES 5.

c. On September 17, 2025, at approximately 3:52 p.m., WERTZ's phone was detected within 2 meters of SUBJECT PREMISES 5.

d. On September 17, 2025, investigators observed a silver 2013 Hyundai Accent ("the Hyundai") bearing California license plate "9UXY520", registered to Angelica Ashley Hernandez Wertz, parked under the car port for apartment 11.

e. On September 18, 2025, at approximately 8:30 a.m., investigators conducted surveillance on SUBJECT PREMISES 5, based on the geolocation data for WERTZ's phone. At approximately 10:06 a.m., investigators observed the Hyundai depart from the vicinity of SUBJECT PREMISES 5. Investigators

---

[6] WERTZ is on active probation and provided the -9573 number to Probation.

followed SUBJECT PREMISES 5 to the area of 7th Street and Gaffey Street in San Pedro and confirmed WERTZ was the driver of the Hyundai.

135. Based on the foregoing, I believe that SUBJECT PREMISES 5 is the primary residence of WERTZ and that evidence of the SUBJECT OFFENSES, as further described in Attachment B-1, will be found at SUBJECT PREMISES 5.

9. <u>JOSHUA ORDAZ</u>

a. *Background on ORDAZ*

136. Based on my review of ORDAZ's criminal history, I am aware that he has felony convictions for felon in possession of a firearm, possession of controlled substances, evading a peace officer, and vehicle theft.

b. *ORDAZ's Role in the Enterprise*

137. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

138. ORDAZ is a member of the 16th Street clique of RSP. He uses the moniker "Youngster."  According to criminal history records, ORDAZ has a "16" and "Ranchero" tattooed on his face, "Ranch" tattooed on his wrist, and "RSP" on his chest.  Based on my knowledge of RSP from this investigation and from speaking to other investigators familiar with the gang, these tattoos evidence RSP membership.  ORDAZ serves the gang as a drug trafficker, and possesses guns in furtherance of his drug dealing.

139. As part of this investigation, ORDAZ was intercepted during the Title III wiretap speaking with CASTRO and CANO-RODRIGUEZ. In one call, On December 11, 2024, CANO-RODRIGUEZ told ORDAZ that CANO-RODRIGUEZ was going to leave town first thing in the morning. CANO-RODRIGUEZ then told ORDAZ that he was going to put ORDAZ up on "some game" and was going to need him [referring to ORDAZ] to handle something. ORDAZ agreed but told CANO-RODRIGUEZ that he needs his "little bitch" with him, to which CANO-RODRIGUEZ told him it would be right there with him. From my training and experience, as well as my review of other wire calls in this case in which coded language is used to refer to firearms, I believe ORDAZ is referring to a gun when he says he needs his "little bitch" with him.

140. ORDAZ is a drug dealer, and carries a gun to protect himself and his drugs. According to LAPD reports, which I have reviewed, on September 29, 2024, ORDAZ saw LAPD officers driving a marked police car in RSP territory and fled into a nearby laundromat where he attempted to hide from the officers inside a small dressing room. After ORDAZ stepped out of the dressing room, one of the officers found a backpack in the dressing room hidden under a pillow. According to the report, the officer felt a heavy, L-shaped object inside the backpack, which in his training and experience felt like a gun. He searched the backpack, which contained a .38 caliber revolver and approximately 159.59 grams of methamphetamine.

141. In the process of hiding from the police, it appears that ORDAZ accidentally shot himself with the gun. ORDAZ began

complaining of pain in his leg area, and officers saw what
appeared to be a fresh gunshot wound to ORDAZ's pelvis.  The
paramedics responded to treat ORDAZ, and ORDAZ admitted to the
paramedic that he shot himself with a "38."

142.  In my training and experience, I believe that 159
grams of methamphetamine is a distribution amount of drugs, as
opposed to a personal use amount.  I am also aware from my
training and experience that drug dealers often carry firearms
on their persons or in their cars to protect their drugs and
drug proceeds, and to protect themselves from rival drug
dealers.

143.  LAPD officers also found ORDAZ in possession of
methamphetamine on October 22, 2024.  According to LAPD reports,
which I have reviewed, LAPD officers were on patrol in Rancho
San Pedro territory in a marked car when they saw ORDAZ sitting
on a motorcycle.  As the officers approached, ORDAZ drove away,
driving the wrong way down the street.  ORDAZ fled from the
officers on motorcycle and then on foot.  He was wearing a fanny
pack and a blue backpack.  ORDAZ ran up the driveway of a house
and discarded the fanny pack and the backpack.  Inside the fanny
pack, ORDAZ possessed approximately 83.1 grams of
methamphetamine, two small "dime bags" for selling drugs, and an
electronic scale.  ORDAZ waived his Miranda rights and admitted
that the drugs, bags, and scale belonged to him.  He claimed
that the drugs were for personal use.  However, based on my
training and experience and speaking with other investigators
familiar with drug crimes, I believe 83.1 grams is a large

quantity of methamphetamine that would be intended for distribution as opposed to personal use. I also believe ORDAZ's possession of the bags and scale is further evidence that he intended to sell the methamphetamine.

c.    Identification of **SUBJECT PREMISES 6**

144. On September 8, 2025, the Honorable Stephen A. Marcus, Superior Court Judge, County of Los Angeles, signed a warrant authorizing the disclosure of geolocation data for phone number (424) 482-6642 number for a period of 30 days. Based on the warrant, conversations with other law enforcement officers, and my participation in the surveillance, I am aware of the following:

a.    On September 11, 2025, based on geolocation data from ORDAZ's phone, investigators conducted surveillance in the area of Bandini and Summerland in San Pedro, California.

b.    On September 11, 2025, ORDAZ's phone was detected in the area of **SUBJECT PREMISES 6**, at approximately 12:35 p.m., based on geolocation data.

c.    On September 11, 2025, at approximately 12:44 p.m., investigators observed ORDAZ exit **SUBJECT PREMISES 6** with a woman believed to be his girlfriend, place a child in the rear seat of a car, go back to **SUBJECT PREMISES 6** and exit, then get in the front passenger seat of the car.

d.    On September 13, 2025, at approximately 10:39 a.m., ORDAZ's cell phone was detected near **SUBJECT PREMISES 6** within 12 meters, based on geolocation data.

145. Based on the foregoing, I believe that **SUBJECT PREMISES 6** is the primary residence of ORDAZ and that evidence of the SUBJECT OFFENSES, as further described in Attachment B, will be found at **SUBJECT PREMISES 6.**

          10.  <u>ANTHONY RONALD GANDARA</u>

              *a.  Background on GANDARA*

146. Based on my review of criminal history records, I am aware that GANDARA, aka "Bimbo," has state felony convictions for Robbery; Assault with Firearm; Possession of a Controlled Substance; Taking Vehicle Without Consent; and Selling Government ID.

              *b.  GANDARA's Role in the Enterprise*

147. Based on my review of law enforcement reports and intercepted Title III wiretap communications, conversations with other law enforcement agents, and my own participation in the investigation, I am aware of the following:

148. GANDARA is a member of RSP and serves the criminal organization as a narcotics dealer, often working closely with TITUS to supply and distribute controlled substances. Based on my review of GANDARA's CCHRS, I am aware that he has "San Pedro" tattooed on his back.

149. Based on my review of communications intercepted pursuant to the Title III wiretap, I am aware that GANDARA was intercepted discussing the possession of narcotics for sale and coordinating with TITUS to sell narcotics. For example:

        a.  As discussed above in paragraph 60, on July 5, 2024, TITUS and GANDARA discussed providing fentanyl to a drug

customer, the customer's complaint about the quality of the fentanyl that GANDARA had provided, and GANDARA's descriptions of the two types of fentanyl he was selling -- "gray" and "white stuff" in "two bags."

b.    On July 8, 2024, law enforcement intercepted a call where TITUS told GANDARA he was with a customer that wanted fentanyl and GANDARA responded: "I got some good fetty. Tell her I got some of that dynamite shit."  In the continued conversation, TITUS and GANDARA arranged to meet and law enforcement set up surveillance at the agreed-upon meeting location.  Surveilling officers then saw GANDARA reach into his sock and give TITUS something.  Based on my training and experience, GANDARA's and TITUS's conduct is consistent with a drug deal.  After the meeting, law enforcement attempted to execute a traffic stop on GANDARA but GANDARA fled.  On July 11, 2024, law enforcement arrested GANDARA for evading arrest. During a search of GANDARA's person and car, law enforcement seized 11.99 grams of PCP and .878 grams of fentanyl.

150. Based on my review of law enforcement reports and conversations with investigative officers, I am also aware that law enforcement searches of GANDARA's car and residence have resulted in seizures of drugs, firearms, and indicia of drug-trafficking.  Specifically:

a.    On September 25, 2024, the Los Angeles Sheriff's Department ("LASD") seized methamphetamine, a firearm, and indicia of drug-trafficking from GANDARA.  Specifically, LASD conducted a traffic stop on a gray 2005 Mercedes bearing Nevada

Plate number "139S94" for expired registration.  The
investigating officer saw two occupants in the car: the driver,
later identified as GANDARA, and the passenger, later identified
as S.R.  While speaking to GANDARA, the investigating officer
noticed a used glass pipe with a burnt bulbous end in the
cupholder, as well as in the rear passenger seat cushion. The
officer requested consent to search GANDARA's person, which
GANDARA agreed to. During the search, the Officer recovered a
large quantity of white crystal-like substance resembling
methamphetamine in his pocket.  A full search of the vehicle and
occupants resulted in the seizure of approximately 12 grams of
methamphetamine total from GANDARA's pocket and from a plastic
bag in the sun visor above GANDARA, two digital scales from
inside the car, an un-serialized, 9mm caliber firearm loaded
with nine rounds of ammunition that was hidden in the engine
compartment of the car. In a post-arrest interview, GANDARA said
that he had purchased the car from S.R. and that the jacket he
was wearing belonged to a friend.  Officers searched the person
of S.R. and did not find contraband.

        b.    As discussed above in paragraph 62, on November
25, 2024, law enforcement intercepted a call in which TITUS
called GANDARA and asked for fentanyl to provide to a third-
party, which GANDARA agreed to deliver to TITUS. On September,
2024, as discussed above in paragraph 63, law enforcement
intercepted a call in which TITUS asked GANDARA for "water"
(i.e., PCP) and GANDARA asked TITUS to bring "bottles" for PCP
distribution.  And, on July 8, 2024, law enforcement intercepted

a call in which TITUS told GANDARA that he had left GANDARA's "strap" in the "shed." After intercepting these calls, law enforcement searched GANDARA's residence on December 12, 2024, and seized a 12-gauge, sawed-off shotgun, six rounds of 12-gauge ammunition, and approximately 99 small glass vials used to sell PCP from the house; and approximately 2.559 grams of fentanyl, multiple small plastic baggies, a semi-automatic firearm with no serial numbers, 61 rounds of 9mm caliber ammunition, and a clear plastic firearm magazine from the shed. Based on my training and experience, I am aware that sawed-off shotguns are commonly used for criminal conduct because they can be more easily concealed.

### c.    Identification of **SUBJECT PREMISES 7**

151. From my review of California Department of Motor Vehicle records, I am aware that SUBJECT PREMISES 7 is a recreational vehicle that is registered to Anthony Ronald Gandara at 322 Grand Avenue in San Pedro, which was the site of the December 12, 2024, execution of a search warrant.

a.    On September 13, 2025, at approximately 11:40 a.m., investigators observed **SUBJECT PREMISES 7** at a recreational vehicle park at 1551 East Young Street in Wilmington.

b.    On September 18, 2025, at approximately 12:00 p.m. investigators observed GANDARA outside near **SUBJECT PREMISES 7.**

c.    On September 1, 2025, I served administrative subpoena HSI-LA-2025-080655-001, on AT&T, for subscriber

information and call detail records/tolls for the -7099[7], used by TITUS, from August 1, 2025, through September 1, 2025.  Between August 3, 2025, and August 31, 2025, there were approximately 11 contacts with the -1161 number used by GANDARA, and the -7099 number, used by TITUS. Based on GANDARA's toll contact with known RSP gang members and narcotics distributors, I believe that there is probable cause to believe that he is continuing to engage in criminal activity.

d.  In addition, there is probable cause to believe that evidence of the Subject Offenses will be found at Subject Premises 8 because, as part of the method and process of GANDARA's historical drug-trafficking, GANDARA has kept narcotics, firearms, and indicia of drug-trafficking in his car and residence, as discussed in paragraphs 150-151 above.

11.  LEOPOLDO CANO-RODRIGUEZ

a.  *Background on CANO-RODRIGUEZ*

152. Based on my review of CANO's criminal history, I am aware that he has felony convictions for possession of a controlled substance while armed, carrying a loaded firearm in public, carjacking, and petty theft.  Since June 2025, CANO-RODRIGUEZ has been detained pretrial in state court on charges

---

[7] On August 1, 2025, I served administrative subpoena HSI-LA-2025-074177-001, on T-Mobile, for subscriber information and call detail records/tolls for the telephone number (310) 863-0577, used by Robert Titus for the time period of June 1, 2025, to August 1, 2025. I searched the records T-Mobile provided to me in the Cash App payment application. The Cash App payment application indicated that the -7099 number as associated with the name of "David Titus," and the handle "$davidtitus13."

of armed robbery and possession of a controlled substance while armed.

### b.   CANO-RODRIGUEZ's Role in the Enterprise

153. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

154. CANO-RODRIGUEZ is an RSP member that goes by the moniker "Camel."  From review of criminal history records, I am aware that CANO-RODRIGUEZ has multiple RSP tattoos, including "RSP" and "The Ranch" on his chest and stomach.

155. CANO-RODRIGUEZ sells drugs for the benefit of the gang.  CANO-RODRIGUEZ and CASTRO were captured on the wire planning to buy drugs, discussing drug pricing, and discussing profit sharing.  The two used coded language to discuss their drug ventures.  For example, in a call on December 4, 2024, CANO-RODRIGUEZ asked CASTRO if he knew anyone who wanted to buy "like half or whatever you know" to get rid of all the "dog food."  CANO-RODRIGUEZ responded that he was only selling "half bags" and "full bags."  From my training and experience and review of other wire calls in this case, I believe CANO-RODRIGUEZ and CASTRO are using coded and intentionally ambiguous language to refer to half-pound units of drugs for sale.

156. On November 27, 2024, CANO-RODRIGUEZ and CASTRO were captured on the wire using coded language to plan to buy drugs from a source of supply referred to as "the Chino."  Shortly thereafter, agents intercepted CASTRO on a call with another co-conspirator, in which CASTRO said he was heading to "Wilmas" to

"re-up" on "dope."  From my training and experience and knowledge of this investigation, I believe CASTRO was saying he was going to replenish his supply of drugs.

157. About half an hour later, other agents and I surveilled CANO-RODRIGUEZ and CASTRO as they traveled to a Chinese restaurant in Wilmington, where CANO-RODRIGUEZ entered the restaurant and left soon after with a large box, before driving away with CASTRO.  LAPD officers conducted a traffic stop and search of the car, where they found a box holding a speaker.  Officers did not open the speaker to search inside, and did not find drugs elsewhere in the car.  Based on the intercepted call, the actions of CANO-RODRIGUEZ at the Chinese restaurant, and the fact that he was carrying a box when he left the restaurant, I believe it is likely drugs were hidden inside the speaker.

158. On December 10, 2024, investigators searched CANO-RODRIGUEZ's home pursuant to a state search warrant.  From my review of the report, I am aware that investigators seized from a car on the property approximately 40 grams of methamphetamine from the center console; a black backpack containing approximately 2,607 grams of methamphetamine in multiple Ziploc bags; a firearm loaded with 19 rounds of ammunition; an additional 25 rounds of live ammunition; a scale; a scoop; and plastic baggies of various sizes.  Inside that car, investigators also found mail addressed to CANO-RODRIGUEZ.  The same day of the search, CANO-RODRIGUEZ called CASTRO and warned him to leave his house to avoid capture: "They hit my house

right now for fucking search warrant for firearms and drugs . . . You need to get the fuck out of your house you got to go dog."

159. CANO-RODRIGUEZ was also captured on the wire advising ORDAZ that CANO-RODRIGUEZ had work for ORDAZ to do for RSP. Based on my training and experience and from speaking to other investigators familiar with RSP, I believe that CANO-RODRIGUEZ is of a higher level in the gang than ORDAZ because he is giving ORDAZ orders.

12. JESSE JULIAN LOPEZ

a.   Background on LOPEZ

160. Based on my review of LOPEZ's criminal history, I am aware that he has felony convictions for felon in possession of a firearm (multiple), mayhem, resisting a peace officer, sale of methamphetamine, and possession of a controlled substance for sale, as well as misdemeanor convictions for domestic violence and theft.

b.   LOPEZ's Role in the Enterprise

161. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

162. LOPEZ is an RSP member who goes by the moniker, "Seco."  From my review of criminal history records, I am aware that LOPEZ has tattoos reading "Harbor Area" and "Rancho San Pedro" on his arms, which I believe are references to his gang membership.  LOPEZ was captured on the wiretap, and makes references to RSP in intercepted calls.  For example, in a call in September 2024, LOPEZ discussed gang politics with a co-

conspirator; LOPEZ said that BALANZAR had been instructed not to discipline a fellow RSP member who had committed an unsanctioned murder because the RSP member was making firearms for RSP.

163. From my review of intercepted calls and surveillance in this case, I am aware that LOPEZ, ZEPEDA, CANO-RODRIGUEZ, and CASTRO assist one another finding drug supply and buyers.  As described above, on October 5, 2024, ZEPEDA agreed to supply LOPEZ with a pound of drugs for resale.  As captured on the intercepted calls, LOPEZ and CASTRO went to ZEPEDA's home in RSP territory.  From there LOPEZ called ZEPEDA to ask where to find a scale to weigh out a pound of drugs.  Agents then surveilled LOPEZ and CASTRO traveling to a motel in Buena Park where CASTRO briefly got out of the car, went into the building, and returned to the car.

164. As another example, and as referenced above, in September 2024, LOPEZ obtained drugs from ZEPEDA for CASTRO to sell to a customer for $500.  CASTRO fronted the drugs to the customer, and after the customer failed to pay the $500, ZEPEDA ordered LOPEZ and CASTRO to collect payment so that ZEPEDA could pay his supplier.

165. LOPEZ also engaged in robbery for the benefit of the gang.  In a series of calls and text messages on June 22, 2024, LOPEZ and MANDAC discussed a potential robbery target.  The two planned to rob the target at gunpoint as he left his residence.

    *c.    Seizure of SUBJECT DEVICE 3, Used by LOPEZ*

166. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my familiarity with RSP, I am aware of the following:

167. On May 8, 2025, a LAPD Officer was patrolling in the area of 3rd Street and Mesa Street when he observed a Hispanic male, later identified as LOPEZ, walking southbound. The Officer observed LOPEZ look to his right in the direction of the Officer and appeared startled; LOPEZ instantly clutched his front waistband area. LOPEZ quickly turned away from the Officer and began running northbound towards the nearby apartments. The Officer formed the opinion that LOPEZ was likely armed with a firearm due to his behavior. The Officer exited the police vehicle and attempted to detain LOPEZ. During the foot pursuit of LOPEZ, the Officer heard the sound of a hard object landing on concrete, consistent with that of a firearm landing on concrete or pavement. The Officer requested backup units due to the belief that LOPEZ had discarded a firearm. LOPEZ was then detained in a parking lot on the southwest corner of Mesa Street and 2nd Street.

168. The Officer advised the backup units of the route of travel during the foot pursuit with LOPEZ and advised the units where he heard the object discarded. Another Officer located a firearm in the rear patio of 360 West 3rd Street, Apartment 31. The Officer interviewed the resident of the apartment who told the Officer that the firearm recovered from her patio was not previously there. The firearm was loaded

with nine rounds of live 9mm caliber ammunition in the magazine.

169. LOPEZ was arrested for a violation of California Penal Code 29800 (A)(1) (felon in possession of a firearm) and transported to LAPD Harbor Division for booking. LAPD seized the following items: a semi-automatic Glock 19 9mm caliber pistol, 9 live rounds of miscellaneous brands of 9mm caliber ammunition and one Samsung cell phone (**SUBJECT DEVICE 3**).

170. In light of the evidence described above regarding LOPEZ's involvement in the Subject Offenses, the government now seeks authorization to search the contents of SUBJECT DEVICE 3 for evidence of the Subject Offenses.

### 13. EDRAS EMMANUELLE ENRIQUEZ DURAN

#### a. *Background on DURAN*

171. Based on my review of DURAN's criminal history, I am aware that he has state felony convictions for Transporting Controlled Substance; Possession Controlled Substance; Receive Stolen Property; Assault with a Deadly Weapon, Not Firearm; Obstruct / Resist Officer; Evade Peace Officer; Vehicle Theft; Possession Controlled Substance While Armed; Felon / Addict in Possession of a Firearm; and Felon in Possession of Ammunition.

#### b. *DURAN's Role in the Enterprise*

172. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

173. DURAN is a member of the 16th Street clique of RSP. He serves the criminal organization as a narcotics dealer. Based

on my review of DURAN's CCHRS, I am aware that DURAN has "RSP" tattooed on his chest, "San Pedro" on his right arm, and "S" and "P" on the back of each of his upper arms.  In addition, I have reviewed phone calls intercepted during the Title III wiretap where RSP Enterprise members have referenced DURAN with respect to his leadership role in the RSP Enterprise.  For example, in a January 7, 2024 call, an unindicted coconspirator told TITUS to go with DURAN to take over an apparent illegal gambling location in RSP territory and instructed that the site would be given to DURAN to operate on behalf of RSP moving forward.  Based on my training, experience, knowledge of the investigation, and conversations with other investigative agents, I am aware that anyone operating an illegal gambling location in RSP territory would need to pay taxes on proceeds up to RSP leadership.

174. Based on my review of law enforcement reports and phone calls intercepted on the Title III wiretap, I am aware that DURAN would use acts of violence to preserve, protect, and expand RSP's criminal operations; to discipline other RSP members; and to enhance his own status within the gang.  For example, in January 20, 2024, in text messages recovered from DURAN's phone that was seized by law enforcement on February 14, 2024, DURAN texted a coconspirator that he was seeking to purchase a firearm that would attach to a drum magazine, which I know, based on my training and experience, is a firearm attachment typically capable of holding up to 50 rounds of ammunition, and he texted a picture of the drum magazine.  A couple weeks later, on February 2, 2024, law enforcement

listened to a jail call in which TITUS, by telephone using coded language, told WERTZ that he went with DURAN and LOPEZ to the home of an RSP associate and robbed a firearm from the RSP associate by force.

175. Based on my review of a searched digital device, I am aware of the following communication by DURAN during this investigation discussing the possession of narcotics for sale: law enforcement viewed a text dated January 23, 2024, from DURAN to an RSP coconspirator asking if the coconspirator knew anyone who wanted to purchase an ounce or two of cocaine at $350 per half-an-ounce.

176. In addition, as discussed above in paragraph 125, DURAN and GIACCO possessed two firearms, a scale, methamphetamine, and cocaine for distribution out of their shared residence in February 2024.

        *c.   Seizure of **Subject Device 1**, Used by DURAN*

177. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own participation in the investigation, I am aware of the following:

178. On February 13, 2024, California Superior Court Judge Laura Laesecke issued a warrant to search DURAN's residence for evidence, contraband, fruits, or instrumentalities of violations of California Penal Code Sections 29800 (A)(1) (felon in possession of a firearm), 182.5(criminal gang conspiracy) and 186.22 (active participant in a criminal street gang).  On February 14, 2024, law enforcement executed the search warrant

at DURAN's residence. During the search, investigators recovered a loaded .40 caliber Glock semi-automatic handgun in a hallway closet leading from the bedrooms towards the front door of the residence. Investigators also recovered a loaded Glock handgun magazine containing live 9mm ammunition and Glock gun parts in a closet located in the northern most bedroom of the residence. Investigators believe that bedroom belongs to DURAN based on personal property observed in the bedroom, including medicine, a prescription, and other medical documents in DURAN's name. Investigators also recovered **SUBJECT DEVICE 1** from the bedroom.

179. On March 6, 2024, the Honorable Jean P. Rosenbluth, United States Magistrate Judge, issued a search warrant in case number 2:24-MJ-01284 for the SUBJECT DEVICE. The warrant authorized the search of the SUBJECT DEVICE for evidence related to violations of 18 U.S.C. § 922(g)(1): felon in possession of a firearm and/or ammunition.

180. During the search of the SUBJECT DEVICE, investigators found firearm-related evidence, including a conversation between DURAN and a contact saved as "Trublokos," in which DURAN requested a "toy," which he also referred to as a "9 glock."

181. In light of the evidence described above regarding DURAN's involvement in RSP, drug trafficking, and the other Subject Offenses, the government now seeks authorization to re-

access the contents of SUBJECT DEVICE 1 to search for evidence of the Subject Offenses.

      14.   RICHARD MANDAC

182. MANDAC is an RSP member who goes by "Richie."  From criminal history records, I am aware that MANDAC has the following felony convictions:

     a.   Voluntary Manslaughter, in violation of California Penal Code Section 192(a), in the Superior Court for the State of California, County of Los Angeles, Case Number NA053043, on or about October 31, 2003;

     b.   Attempted Carjacking, in violation of California Penal Code Sections 215(a), 664, in the Superior Court for the State of California, County of Los Angeles, Case Number NA053043, on or about October 31, 2003;

     c.   Prohibited Possession of a Firearm, in violation of California Penal Code Section 29800(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number NA112518, on or about August 12, 2019;

     d.   Prohibited Possession of a Firearm, in violation of California Penal Code Section 29800(a)(1), in the Superior Court for the State of California, County of Los Angeles, Case Number NA115822, on or about January 28, 2021;

     e.   Prohibited Possession of a Firearm, in violation of California Health and Safety Code Section 11366.8(a), in the Superior Court for the State of California, County of Los Angeles, Case Number NA115822, on or about January 28, 2021;

f.    Prohibited Possession of a Controlled Substance in Jail, in violation of California Penal Code Section 4573.6(a), in the Superior Court for the State of California, County of Los Angeles, Case Number NA115822, on or about September 13, 2021; and

g.    Vehicle Theft, in violation of California Vehicle Code Section 10851(a), in the Superior Court for the State of California, County of Los Angeles, Case Number TA154901, on or about September 24, 2021.

183. MANDAC was arrested on April 1, 2025, for a violation of California Health and Safety code 11370.1(A) (controlled substance possession with a firearm. The case is pending trial and the next court hearing is set for October 13, 2025.

184. From my review of intercepted communications in which MANDAC frequently speaks in coded language, I have learned that MANDAC buys and sells firearms, including from other RSP members.  Several examples of such calls and text messages are below:

a.    On May 22, 2024, MANDAC, by social media using coded language, told an RSP associate that he had discarded a firearm during a traffic stop to keep police from finding it on him, and asked the associate what firearms he had for sale and at what price.

b.    On June 16, 2024, by text message using coded language, MANDAC told an RSP associate that MANDAC was interested in buying another firearm.

c.    On June 19, 2024, MANDAC shared via social media

an image of a firearm that he wanted to sell and quoted a price of $700.

d.    On June 19, 2024, MANDAC told LOPEZ via telephone that MANDAC planned to buy a firearm from BALANZAR.

e.    On June 26, 2024, MANDAC, via social media using coded language, agreed to try to find a buyer for an assault rifle that a co-conspirator was offering for sale for $250.

185. On July 11, 2024, investigators executed a federal search warrant at the residence where MANDAC was staying in Wilmington, California.  Investigators found two guns in one of the bedrooms: a Taurus G3c 9mm caliber pistol with serial number ACB512797, loaded with 12 rounds of 9mm ammunition; and a 9mm pistol with no serial number that was loaded with seven rounds of 9mm ammunition.  The FBI examined the Taurus 9mm pistol and the 19 rounds of ammunition found at the residence and determined that the Taurus and the ammunition were each manufactured outside of California, and must have traveled in or affecting interstate or foreign commerce before being found in California.

186. Following the search of the residence, investigators Mirandized and interviewed MANDAC.  MANDAC admitted that he lived at the residence and that both of the guns were his and did not belong to his girlfriend, who also lived at the residence.  MANDAC admitted he knew the guns were loaded.  He said he had obtained them a few weeks prior.

187. Evidence from the wiretap also shows that MANDAC is involved in robberies.  As discussed above, on June 22, 2024,

MANDAC and LOPEZ spoke over the phone and made plans to rob an
individual at gunpoint as he left a residence; and MANDAC told
LOPEZ that he would be there to pick him up in ten minutes.

> a.    *Seizure of MANDAC's Phone, a forensic copy
> of which is* **SUBJECT DEVICE 4**

188. Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
participation in the investigation, I am aware of the
following:

189. On June 28, 2024, the Honorable A. Joel Richlin,
United States Magistrate Judge, issued a search warrant in
case number 2:24-MJ-03872 for the premises at 1046 North
Banning Boulevard, Wilmington, California 90744. The warrant
authorized the search of subject devices for evidence related
to violations of 18 U.S.C. § 922(g)(1): felon in possession of
a firearm and/or ammunition.

190. During the execution of the warrant, law enforcement
seized the following items: a loaded black steel, semi-automatic
9mm caliber Taurus handgun containing one magazine with
approximately 12 live rounds of miscellaneous brands of 9mm
caliber ammunition; a loaded black steel, semi-automatic 9mm
caliber Polymer 80 handgun containing one magazine with
approximately 7 live rounds of miscellaneous brands of 9mm
caliber ammunition; one Apple iPhone with serial number

357442665894385, and one grey Android with International Mobile Equipment Identity ("IMEI") number 015735002448847, belonging to MANDAC.  Investigators made a forensic copy of the Android cell phone, referred to here as "**SUBJECT DEVICE 4.**"

191. During a search of **SUBJECT DEVICE 4**, I found several conversations in various applications in which MANDAC discussed buying and selling guns in coded language.  In addition, I found the following text message exchange dated July 8, 2024, with a contact listed as "TRAVI LONGO":

> **MANDAC:** Travis this is Richie from Rancho remember me?
> **LONGO:** Yea what's good bro?
> **MANDAC:** Can u still get what I got from u before
> **LONGO:** Yes sir
> **MANDAC:** What the ticket for a whole one
> **LONGO:** 550
> **MANDAC:** Ok Kool. I'm a holla in a bit
> **LONGO:** Koo lmk

192. I conferred with other law enforcement officers regarding the conversation above referencing the "ticket for a whole one." Law enforcement officers with experience investigating drug crimes believed the conversation was a reference to drugs, rather than firearms.  Based on the foregoing, including MANDAC's role in RSP, the gangs use of drug trafficking to enrich the enterprise, and MANDAC's above

conversations regarding drug trafficking, the government seeks to search **SUBJECT DEVICE 4** for evidence of the Subject Offenses.

### XII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[8]

193. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been

---

[8] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has

been responsible for creating or maintaining records, documents,

programs, applications, and materials on the device.  That

evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places

where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently

used tasks and processes; online nicknames and passwords in the

form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in

use; and file creation dates and sequence.

       c.    The absence of data on a digital device may be

evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the

device was being controlled remotely by such software.

       d.    Digital device users can also attempt to conceal

data by using encryption, steganography, or by using misleading

filenames and extensions.  Digital devices may also contain

"booby traps" that destroy or alter data if certain procedures

are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for

devices or data that cannot currently be decrypted.

   194. Based on my training, experience, and information from

those involved in the forensic examination of digital devices, I

know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

195. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a

user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a
device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

      b.    In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

      c.    Thus, the warrants I am applying for regarding
SUBJECT PREMISES 1 through SUBJECT PREMISES 7 would permit law
enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress ZEPEDA, WERTZ, TITUS, GANDARA, CASTRO,
ORDAZ, BALANZAR, and GIACCO's thumb and/or fingers on the
device(s); and (2) hold the device(s) in front of ZEPEDA, WERTZ,
TITUS, GANDARA, CASTRO, ORDAZ, BALANZAR, and GIACCO's face with
his or her eyes open to activate the facial-, iris-, and/or
retina-recognition feature.

      d.    Additionally, in my training and experience, the
person who is in possession of a device or has the device among
his or her belongings at the time the device is found is likely
a user of the device.  However, in my training and experience,

that person may not be the only user of the device whose
physical characteristics are among those that will unlock the
device via biometric features, and it is also possible that the
person in whose possession the device is found is not actually a
user of that device at all.

## XIII. <u>REQUEST FOR NIGHTTIME SERVICE</u>

196. I request that the Court authorize investigators to
serve these warrants during the nighttime, as set forth under
Fed. R. Crim. Proc. 41(e)(2)(A)(ii). Good cause for nighttime
service exists because of the heightened risk of violence from
RSP Enterprise members. Due to the heightened law enforcement
attention on RSP over the last few years, RSP members have
become knowledgeable of the patterns, tactics, rules, and laws
that control law enforcement's interaction with gang members,
including that law enforcement typically executes search
warrants at 6:00 a.m. The ability to serve the requested
warrants at night will provide law enforcement with a better
opportunity to enter the properties without incident to ensure
everyone's safety. Given these facts, I believe that nighttime
service is warranted in this case.

## XIV. <u>CONCLUSION</u>

197. For all the reasons described above, there is probable
cause to believe the following:

a.    NANIA, PEREZ, WERTZ, CANO-RODRIGUEZ, ZEPEDA,
ORDAZ, LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and
GANDARA violated 18 U.S.C. § 1962(d) (Racketeer Influenced and
Corrupt Organizations Conspiracy);

b.    NANIA, PEREZ, WERTZ, CANO-RODRIGUEZ, ZEPEDA, ORDAZ, LOPEZ, BALANZAR, CASTRO, DURAN, GIACCO, TITUS, and GANDARA violated 21 U.S.C. § 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances); and

c.    MANDAC violated 18 U.S.C. § 922(g)(1) (Felon in Possession of a Firearm and Ammunition).

198. Further, there is probable cause to believe that the items listed in:

a.    Attachment B-1, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1962(d), and in any digital devices seized, of the Subject Offenses, will be found at, in, or on SUBJECT PREMISES 1-8 and SUBJECT VEHICLE 1, as described in Attachments A-1 through A-16 and A-19; and

b.    Attachment B-2, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in or on Subject Devices 1-4, as described in Attachments A-17 and A-18.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 3rd day of October, 2025.

_____
HONORABLE PEDRO V. CASTILLO
UNITED STATES MAGISTRATE JUDGE